**Certiorari Granted, No. 31,909, September 15, 2009**

**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

**Opinion Number: 2009-NMCA-104**

**Filing Date: July 30, 2009**

**Docket No. 27,589**

**STATE OF NEW MEXICO,**

      **Plaintiff-Appellee,**

**v.**

**RUDY B.,**

      **Child-Appellant.**

**APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY**
**Monica Zamora, District Judge**

Gary K. King, Attorney General
Santa Fe, NM
M. Victoria Wilson, Assistant Attorney General
Albuquerque, NM

for Appellee

Hugh W. Dangler, Chief Public Defender
J.K. Theodosia Johnson, Assistant Appellate Defender
Santa Fe, NM

for Appellant

Juvenile Law Center
Marsha Levick
Jessica Feierman
Philadelphia, PA

for Amicus Curiae

**OPINION**

**CASTILLO, Judge.**

**{1}** The primary issue in this appeal concerns a challenge to the statutory procedure used to determine whether a youthful offender is sentenced as an adult or as a juvenile. Under the Delinquency Act, NMSA 1978, §§ 32A-2-1 to -33 (1993, as amended through 2007) (Delinquency Act), the trial court determines whether to impose a juvenile or adult sentence after making findings based on evidence presented at an amenability hearing. Section 32A-2-20(B)(1), (2). In the case before us, the trial court found that Child was not amenable to treatment, and Child was sentenced as an adult to twenty-five years in prison. Child appeals his sentence and urges this Court to overrule *State v. Gonzales*, 2001-NMCA-025, ¶ 1, 130 N.M. 341, 24 P.3d 776, and urges this Court to hold that *Apprendi v. New Jersey*, 530 U.S. 466 (2000), requires a jury determination of the facts necessary to impose an adult sentence. Child additionally asserts that there was insufficient evidence to support the findings necessary to sentence him as an adult and that his separate convictions for shooting from a motor vehicle resulting in great bodily harm and aggravated battery with a deadly weapon violate double jeopardy. After considering the line of cases decided since *Apprendi* and *Gonzales*, we conclude that *Gonzales* should be overruled and that *Apprendi* applies to the amenability hearings of youthful offenders. We need not reach the question of substantial evidence because we remand this case to the trial court for resentencing. We also hold that the resentencing should be based on all of the counts to which Child pleaded because there was no double jeopardy violation.

## I.     BACKGROUND

**{2}** Child was involved in a gang fight in a parking lot. Under the impression that one of the other gang members had a gun, Child pulled out his own weapon and began shooting. He hit three people, one of whom was rendered a quadriplegic.

**{3}** Child was charged by petition under the Delinquency Act for nine counts: (1) three counts of shooting at or from a motor vehicle; (2) three counts of aggravated battery with a deadly weapon or, in the alternative, aggravated battery resulting in great bodily harm; (3) two counts of negligent use of a deadly weapon; and (4) one count of unlawful possession of a handgun by a minor. The State provided notice of its intent to seek an adult sentence, pursuant to Section 32A-2-20(A). The trial court then issued an administrative closing order on the petition, and the case proceeded forward on a grand jury indictment on essentially the same counts.

**{4}** Before trial, Child pleaded as a youthful offender under the Delinquency Act to four of the counts: two counts of shooting from a motor vehicle resulting in great bodily harm and two counts of aggravated battery with a deadly weapon. After the plea agreement was accepted, the trial court held an amenability hearing in order to determine whether Child was amenable to treatment and rehabilitation or whether Child should be subject to an adult sentence. *See* § 32A-2-20(B). The trial court concluded that Child was not amenable to treatment, the case proceeded to sentencing, and Child was sentenced to twenty-five years in prison. Child appeals.

## II.    DISCUSSION

**{5}**    Child makes three arguments on appeal.  First, he urges this Court to overrule *Gonzales* and to hold that the Sixth Amendment and *Apprendi* require a jury to determine beyond a reasonable doubt whether a youthful offender is amenable to treatment as a juvenile in an amenability proceeding held pursuant to Section 32A-2-20(B).  Second, Child argues that in any event, the trial court incorrectly determined that he was not amenable to treatment.  Third, Child contends that the convictions for violations of NMSA 1978, Section 30-3-8 (1993) (shooting at or from a motor vehicle) and NMSA 1978, Section 30-3-5 (1969) (aggravated battery, enhanced by NMSA 1978, Section 31-18-16 (1993) for the use of a firearm) violate the constitutional prohibition against double jeopardy.  We address each argument in turn.

### A.    Amenability Hearings and *Apprendi*

**{6}**    We begin our discussion by briefly considering the history of juvenile criminal disposition.  At common law, children younger than seven were not held criminally responsible, children over fourteen were held to the same standards as adults, and children between seven and fourteen were presumed to lack criminal capacity, although the presumption was rebuttable.  Courtney P. Fain, Note, *What's in a Name? The Worrisome Interchange of Juvenile "Adjudications" with Criminal "Convictions,"* 49 B.C. L. Rev. 495, 496-99 (2008).  At the end of the nineteenth century, reformers began to develop a separate criminal justice system for juvenile offenders.  *See id.* at 498; Paul Piersma et al., *Law and Tactics in Juvenile Cases*, 1997 A.L.I. 3d ed. § 1.1, at 5.  These courts were intended to focus on "the needs of the offender with a goal of rehabilitation," and "[t]he objective of the juvenile court was to rehabilitate the child and protect society rather than to adjudge guilt[.]"  Fain, *supra*, at 499.

**{7}**    Many of the constitutional protections afforded to adult criminal proceedings were not provided to children who were charged with criminal offenses.  Piersma, *supra*, at 13.  This changed in 1966, when the Supreme Court of the United States decided *Kent v. United States*, 383 U.S. 541 (1966).  *Kent* held that a juvenile court may not waive jurisdiction over a juvenile offender and transfer the offender to face prosecution as an adult without a hearing, effective assistance of counsel, and a statement of reasons.  *Id.* at 554.  One year later, the Court considered the constitutional protections afforded to juveniles during the adjudication proceeding and determined that a juvenile offender is entitled to adequate notice of the pending charges, to counsel who is either retained by the offender or provided by the state, to the privilege against self-incrimination, and to confront witnesses who testify against him.  *See In re Gault*, 387 U.S. 1, 13, 33, 41, 55, 57 (1967).  Since then, juveniles have been granted the additional safeguard of proof beyond a reasonable doubt in a juvenile adjudication, *In re Winship*, 397 U.S. 358, 368 (1970), as well as protection from double jeopardy.  *See Breed v. Jones*, 421 U.S. 519, 532 (1975) (holding that double jeopardy is violated when a juvenile is subject to adjudication in the juvenile system, determined to be unamenable to treatment at the juvenile disposition, and then transferred and retried in the adult system).  Notably, the Supreme Court of the United States has explicitly refused to require the states to extend the right to a jury trial to juvenile adjudications.  *See McKeiver*

3

*v. Pennsylvania*, 403 U.S. 528, 545 (1971).

**{8}**    During the 1980s, "substantial [public] misperception regarding increases in juvenile crime led many states to begin passing legislation that took a more punitive approach to juvenile justice." Kelly K. Waterfall, Note, State v. Muniz*: Authorizing Adult Sentencing of Juveniles Absent a Conviction that Authorizes an Adult Sentence*, 35 N.M. L. Rev. 229, 231 (2005) (alteration in original) (internal quotation marks and footnote omitted). These approaches were "designed to crack down on juvenile crime, and generally involved expanded eligibility for criminal court processing and adult correctional sanctioning." *Id.* (internal quotation marks and footnote omitted). With this history in mind, we turn to examine the relevant statutory backdrop of New Mexico's juvenile system.

### 1.    New Mexico's Juvenile System

**{9}**    New Mexico's early treatment of juveniles mirrored that of other states. At the time of statehood in 1912, juveniles accused of criminal acts were treated no differently from adults. *Peyton v. Nord*, 78 N.M. 717, 723, 437 P.2d 716, 722 (1968). In 1917, the Legislature adopted the first juvenile code. *Id.* When faced with the question of whether a juvenile has a right to a jury trial, the New Mexico Supreme Court relied on the right to a jury trial as enunciated in Article II, Section 12 of the New Mexico Constitution: "The right of trial by jury as it has heretofore existed shall be secured to all and remain inviolate." Based on the fact that juveniles charged with a felony were entitled to a jury trial at the time the constitution was adopted in 1912, the *Peyton* court held that such juveniles are guaranteed a jury trial in New Mexico. 78 N.M. at 723, 437 P.2d at 722.

**{10}**    The next development relevant to our analysis took place in 1993 when New Mexico joined other states in an effort to establish "statutory authority to impose adult sanctions on children convicted of certain criminal offenses." Waterfall, *supra*, at 231. The 1993 amendments to the children's code comprised what is now known as the Delinquency Act, Sections 32A-2-1 to -33. *See* Waterfall, *supra*, at 231. Under the Delinquency Act, there are three classes of juvenile offenders: delinquent offenders, serious youthful offenders, and youthful offenders. *See* § 32A-2-3(C), (H), (I). As this Court explained in *Gonzales*: "These classifications reflect the rehabilitative purpose of the Delinquency Act, coupled with the realization that some juvenile offenders cannot be rehabilitated given the limited resources and jurisdiction of the juvenile justice system." 2001-NMCA-025, ¶ 16. A delinquent offender is "subject to juvenile sanctions only," Section 32A-2-3(C), and a youthful offender is "subject to adult or juvenile sanctions," Section 32A-2-3( I). A serious youthful offender is "an individual fifteen to eighteen years of age who is charged with and indicted or bound over for trial for first degree murder." Section 32A-2-3(H). If convicted of first degree murder, serious youthful offenders "cannot be rehabilitated using existing resources in the time available" and "are excluded from the jurisdiction of the children's court." *Gonzales*, 2001-NMCA-025, ¶ 16. We limit our analysis to youthful offenders.

**{11}**    In order to invoke an adult sentence for a youthful offender, the children's court attorney is required to file a notice of intent to invoke an adult sentence. Section 32A-2-20(A). "If the children's court attorney has filed a notice of intent to invoke an adult

4

sentence and the child is adjudicated as a youthful offender," the trial court must make the following two findings before imposing an adult sentence:

> (1)    the child is not amenable to treatment or rehabilitation as a child in available facilities; and

> (2)    the child is not eligible for commitment to an institution for children with developmental disabilities or mental disorders.

Section 32A-2-20(B).

**{12}**    The statute further directs the trial court to consider eight factors in order to make the required findings:

> (1)    the seriousness of the alleged offense;

> (2)    whether the alleged offense was committed in an aggressive, violent, premeditated or willful manner;

> (3)    whether a firearm was used to commit the alleged offense;

> (4)    whether the alleged offense was against persons or against property, greater weight being given to offenses against persons, especially if personal injury resulted;

> (5)    the sophistication and maturity of the child as determined by consideration of the child's home, environmental situation, emotional attitude and pattern of living;

> (6)    the record and previous history of the child;

> (7)    the prospects for adequate protection of the public and the likelihood of reasonable rehabilitation of the child by the use of procedures, services and facilities currently available; and

> (8)    any other relevant factor, provided that factor is stated on the record.

Section 32A-2-20(C).

**{13}**    New Mexico's statutory system of handling juvenile cases is unusual. *See* Daniel M. Vannella, Notes, *Let the Jury Do the Waive:  How* Apprendi v. New Jersey *Applies to Juvenile Transfer Proceedings*, 48 Wm. & Mary L. Rev. 723, 753 (2006).  Most states operate a judicial waiver system, which allows a judge "to waive juvenile court jurisdiction so that the juvenile may be tried as an adult." *Id.* at 739 (identifying forty-five states and the

District of Columbia as applying a judicial waiver system). "The New Mexico [L]egislature ha[s] created a unique juvenile transfer system: all juveniles [are] tried in juvenile court, after which the judge [may] sentence certain offenders as adults following an amenability hearing." *Id.* at 753. Thus, in the typical system, the waiver proceeding occurs at the beginning of a case and determines whether an offender will be placed in the juvenile or the adult system. This initial decision governs the case for the entirety of the criminal process: from trial to sentencing. In New Mexico, the offender—unless charged with first degree murder—is tried entirely within the juvenile system, and whether to impose adult sanctions is only considered at the sentencing phase. *See* Waterfall, *supra*, at 232-33.

**{14}** Child argues that the holding of the United States Supreme Court in *Apprendi*, together with its subsequent related cases, requires that the determination about whether a youthful offender is amenable to treatment under Section 32A-2-20(B)(1) must be made by a jury and be proved beyond a reasonable doubt. In *Gonzales*, however, this Court held that "*Apprendi* is inapplicable to [amenability] findings." 2001-NMCA-025, ¶ 32. The State argues that this Court's opinion in *Gonzales* should remain controlling. "We review issues of statutory and constitutional interpretation de novo." *State v. Lucero*, 2007-NMSC-041, ¶ 8, 142 N.M. 102, 163 P.3d 489. We first assess the circumstances and holdings in the *Apprendi* line of cases, and we then turn to *Gonzales*.

### 2.    *Apprendi*

**{15}** Thirty-two years prior to the *Apprendi* decision, the Supreme Court of the United States decided *Duncan v. Louisiana*, 391 U.S. 145 (1968). In that case, the Court held that the Due Process Clause of the Fourteenth Amendment required the states to afford the Sixth Amendment right to a jury trial to defendants charged with serious criminal offenses. *Id.* at 149, 158. In so holding, the Court stated that "the right to jury trial in serious criminal cases is a fundamental right and hence must be recognized by the [s]tates as part of their obligation to extend due process of law to all persons within their jurisdiction." *Id.* at 154. Decades later, in *Apprendi*, the question before the Court was "whether the Due Process Clause of the Fourteenth Amendment requires that a factual determination authorizing an increase in the maximum prison sentence . . . be made by a jury on the basis of proof beyond a reasonable doubt." 530 U.S. at 469. Thus, the primary concern of the *Apprendi* Court was to explain that the scope of the Sixth Amendment right—whether due process protections require a jury to make any findings of facts necessary to increase a basic sentence. *See id.* at 476-77.

**{16}** The defendant in *Apprendi* was charged with and pleaded guilty to, among other things, second degree possession of a firearm for an unlawful purpose. *Id.* In the plea agreement, the state indicated that it could request the court to enhance the defendant's sentence with respect to that count, based on grounds that the offense "was committed with a biased purpose." *Id.* at 470. The trial court found, by a preponderance of the evidence, that the defendant had "a purpose to intimidate" and applied the sentence enhancement. *Id.* at 471 (internal quotation marks and citation omitted).

**{17}** The Sixth Amendment to the United States Constitution guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an

6

impartial jury." U.S. Const. amend VI. Read together with the Fourteenth Amendment, "these rights indisputably entitle a criminal defendant to a jury determination that [he] is guilty of every element of the crime with which he is charged, beyond a reasonable doubt." *Apprendi*, 530 U.S. at 477 (alteration in original) (internal quotation marks and citation omitted). Historically, "trial by jury has been understood to require that the truth of every accusation . . . should afterwards be confirmed by the unanimous suffrage of twelve of [the defendant's] equals and neighbors." *Id.* (second alteration in original) (emphasis omitted) (internal quotation marks and citation omitted). Thus, "any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Id.* at 525 (internal quotation marks and citation omitted). "[T]he relevant inquiry is one not of form, but of effect—does the required finding expose the defendant to a greater punishment than that authorized by the jury's guilty verdict?" *Id.* at 494.

{18}    The *Apprendi* Court characterized the underlying offense—weapons possession—and the enhancement—biased purpose—as "two acts that [the state] has singled out for punishment" because the defendant was threatened "with certain pains if he unlawfully possessed a weapon and with additional pains if he selected his victims with a purpose to intimidate them because of their race." *Id.* at 476. The enhancement statute required a second showing of intent, apart from the intent requirement of the underlying offense, *id.* at 493, and the effect of applying the enhancement transformed a second degree offense into a first degree offense. *Id.* at 494. For these reasons, the *Apprendi* Court held that the sentencing scheme was "an unacceptable departure from the jury tradition that is an indispensable part of our criminal justice system." *Id.* at 497.

{19}    As discussed before, the *McKeiver* Court held that there is no Sixth Amendment right to a jury trial in juvenile proceedings. *See* 403 U.S. at 545. As a result, there may be a preliminary question as to the applicability of *Apprendi* when there is no Sixth Amendment right to a jury trial, and the concurring opinion contains two approaches that would allow application of *Apprendi* notwithstanding *McKeiver*. Special Concurrence ¶ 65. This issue, however, was not raised or briefed by the parties. Nor was the issue addressed in *Gonzales*, 2001-NMCA-025. At this juncture, we are reluctant to address this question in the absence of argument or authority. Accordingly, because Child frames his question as whether we should overrule the holding of *Gonzales* and because the State does not raise an objection based on *McKeiver*, we will phrase the issue presented in this appeal as it was set forth in *Gonzales*: "whether the due process clause of the Fourteenth Amendment to the United States Constitution requires that the Section 32A-2-20(B) findings be made by a jury beyond a reasonable doubt." 2001-NMCA-025, ¶ 20. Thus, we continue our analysis to consider whether the rights defined in *Apprendi* and its progeny are applicable to amenability hearings under Section 32A-2-20(C). We evaluate this question in light of the recent line of United States Supreme Court cases interpreting *Apprendi,* beginning with *Ring v. Arizona*, 536 U.S. 584 (2002), and concluding with *Oregon v. Ice*, __U.S. __, 129 S. Ct. 711 (2009).

3.    **From *Ring* to *Ice***

{20}    Two years after deciding *Apprendi*, the Supreme Court of the United States

7

considered Arizona's death penalty sentencing procedures. *Ring*, 536 U.S. at 588-89. Under Arizona law, the trial court determined whether the death penalty was justified by the presence of aggravating factors. *Id.* at 588. The *Ring* Court concluded that this procedure did not comport with *Apprendi* because "[c]apital defendants, no less than noncapital defendants, . . . are entitled to a jury determination of any fact on which the legislature conditions an increase in their maximum punishment." *Ring*, 536 U.S. at 589. Two years after that, the Court decided *Blakely v. Washington*, 542 U.S. 296 (2004). In that case, the trial court enhanced the defendant's sentence based on a finding that the crime had been committed with deliberate cruelty. *Id.* at 298. The *Blakely* Court applied *Apprendi* to conclude that the trial court "could not have imposed the exceptional [ninety]-month sentence solely on the basis of the facts admitted in the guilty plea." *Blakely*, 542 U.S. at 301, 304. Thus, the Court reversed the defendant's sentence, remarking that

> [t]he Framers would not have thought it too much to demand that, before depriving a man of three more years of his liberty, the [s]tate should suffer the modest inconvenience of submitting its accusation to the unanimous suffrage of twelve of his equals and neighbours, rather than a lone employee of the [s]tate."

*Id.* at 313-14 (internal quotation marks and citation omitted).

**{21}** The next case in line is *United States v. Booker*, 543 U.S. 220 (2005). In *Booker*, a divided Court held that the federal sentencing guidelines implicate the holdings in *Apprendi* and *Blakely*. *See Booker*, 543 U.S. at 243-44. A different majority further concluded that the mandatory provisions of the guidelines were unconstitutional under the lens of *Apprendi*. *Booker*, 543 U.S. at 245. Following *Booker*, the Supreme Court handed down *Cunningham v. California*, 549 U.S. 270 (2007), which dealt with California's determinate sentencing law. *Id.* at 274. Under California law, the defendant was convicted of a crime that carried three possible sentences—six, twelve, or sixteen years. *Id.* at 275. The trial court was obligated to impose the twelve-year sentence unless it found aggravating factors. *Id.* The Supreme Court considered the sentencing scheme under the *Apprendi* line of cases and determined that "[f]actfinding to elevate a sentence from [twelve] to [sixteen] years, our decisions make plain, falls within the province of the jury employing a beyond-a-reasonable-doubt standard, not the bailiwick of a judge determining where the preponderance of the evidence lies." *Cunningham*, 549 U.S. at 273, 292. The *Cunningham* Court held that because the determinate sentencing scheme "authorizes the judge, not the jury, to find the facts permitting an upper[-]term sentence, the system cannot withstand measurement against our Sixth Amendment precedent." *Id.* at 293. Recently, our Supreme Court has applied *Apprendi* in the context of sentence enhancements based on aggravating factors. *State v. Frawley*, 2007-NMSC-057, ¶ 1, 143 N.M. 7, 172 P.3d 144.

**{22}** The most recent case in the *Apprendi* line is *Ice*, decided nine years after *Apprendi*. *Ice* establishes a threshold inquiry for the application of *Apprendi*: unless the jury played a historical role in the issue to be decided, *Apprendi*'s "core concern is inapplicable." *Ice*, 129 S. Ct. at 718. We thus consider *Ice* and whether it proscribes the application of *Apprendi* under the present circumstances. The issue before the *Ice* Court was whether the

8

Sixth Amendment required a jury determination of the facts necessary to impose consecutive, rather than concurrent, sentences. 129 S. Ct. at 714-15. The controlling state statute in *Ice* required sentences to run concurrently unless the trial court found certain facts, in which case the court could order consecutive sentences. *Id.* at 715. The defendant argued that he had a Sixth Amendment right to have a jury find the facts that permitted consecutive sentencing. *Id.* at 716. The *Ice* Court determined that the "historical record demonstrates that the jury played no role in the decision to impose sentences consecutively or concurrently," *id.* at 717, that consecutive sentences were the prevailing historical practice, *id.* at 718, and that the state statute establishing concurrent sentences as the default merely granted statutory protections that were "meant to temper the harshness of the historical practice." *Id.* Thus, *Apprendi* did not apply. *Ice*, 129 S. Ct. at 719.

### 4.    *Ice* and Amenability Hearings

**{23}**    The State relies on *Ice* for the proposition that *Apprendi* does not apply to amenability hearings because the amenability determination for youthful offenders has not historically been decided by a jury. In *Ice*, the Court evaluated the history of the jury's role in sentencing to determine whether the judge or the jury traditionally decided the specific issue of concurrent or consecutive sentences. The application of *Ice* is not so straightforward in the context of juvenile sentencing. As explained in *Gonzales*, amenability hearings for sentencing purposes were incorporated into the New Mexico juvenile justice system by the 1993 amendments to the Children's Code. 2001-NMCA-025, ¶¶ 15-18. Under Section 32A-2-20(B), amenability findings are made by judges, but this does not answer our question. Expanding the time frame, we observe that throughout history, juveniles have received a range of treatment by the courts. As we have described, at common law, children over fourteen were treated as adults and children between seven and fourteen could be treated as adults for purposes of trial and sentencing. *See* Fain, *supra*, at 498-99. After the national policy changes at the turn of the century, the juvenile courts emerged, and the state was given "a parens patriae interest in preserving and promoting the welfare of the child." Tina Chen, Notes and Comments, *The Sixth Amendment Right to a Jury Trial: Why is it a Fundamental Right for Adults and Not Juveniles?*, 28 J. Juv. L. 1, 3 (2007) (internal quotation marks and citation omitted). To achieve the goals of the reformers, children were tried "at informal proceedings without a jury." *Id.* at 2 (internal quotation marks and citation omitted). "The informal nature of the juvenile justice system set few guidelines to be followed and gave judges great discretion in deciding what types of resources and evidence are to be presented." *Id.* at 3. Over time, these juvenile proceedings were infused with certain constitutional safeguards; a jury trial, however, is not constitutionally mandated by the Sixth Amendment in juvenile court proceedings. *See McKeiver*, 403 U.S. at 545. Thus, it could be argued that the historical trend in juvenile court systems has been to afford juries no role in juvenile proceedings.

**{24}**    This characterization, however, is misleading. A juvenile who is transferred to the adult system is afforded the constitutional rights of an adult, presumably including the jury trial right, and that juvenile is sentenced as an adult, with the attendant *Apprendi* protections. The offender who remains in the juvenile system is afforded the benefits of that system and its sentencing procedures, but need not be afforded the right to a jury trial. It is therefore not

9

the status of the offender as a juvenile that determines the sentencing scheme and attendant protections.  Rather, the sentencing scheme is determined by the decision to place the offender in the adult or the juvenile system.  Consequently, instead of considering whether juries have historically had a role in juvenile proceedings, we evaluate whether juries have historically made the determinations that lead to a juvenile being placed in one system or the other.

**{25}**    In New Mexico, as we have explained, that determination is made at a post-guilt-phase amenability hearing.  *See* § 32A-2-20(B)(1).  This proceeding is similar to the transfer proceedings that are held in most other jurisdictions in that both proceedings result in a determination of a juvenile's legal status.  We acknowledge that most of those jurisdictions have held that *Apprendi* does not apply to transfer proceedings.  *See* Vannella, *supra*, at 751.  In general, courts have offered three bases for not applying *Apprendi* to transfer proceedings: (1) adequate procedural safeguards exist in the juvenile system, (2) transfer proceedings are jurisdictional in nature, and (3) introduction of a jury will erode the special protections offered to offenders who benefit from the juvenile system.  *See id.* at 751-53 (citing cases to that effect).  We are not persuaded that the reasoning applying to transfer proceedings requires us to foreclose the application of *Apprendi* to post-guilt-phase amenability hearings.

**{26}**    Most importantly, post-guilt-phase amenability hearings are not jurisdictional.  Transfer proceedings take place before trial, immediately after charges are instigated.  In those states, the transfer hearing answers a purely legal question—in which court will the juvenile be charged?  *See People v. Beltran*, 765 N.E.2d 1071, 1076 (Ill. App. Ct. 2002) (explaining that a transfer hearing is "dispositional, not adjudicatory" and that "the hearing determines not the minor's guilt but the forum in which his guilt may be adjudicated").  In New Mexico the decision to treat a youthful offender as an adult (1) does not occur until guilt has been determined, (2) is not a question of law but instead is a factual determination, and (3) affects only the offender's status for sentencing purposes.  Thus, in New Mexico, the amenability determination is a means of gauging whether an offender should be exposed to a particular sentence and not a means of determining what court will have jurisdiction over the offender, as is the case in transfer jurisdictions.

**{27}**    In turning to our inquiry, we observe that because post-guilt phase amenability hearings are unusual and of relatively recent development, we have little historical information on which to rely.  Prior to *Ice*, however, courts applied *Apprendi* without stopping to evaluate the historical jury function.  As *Ice* made no pretense of overruling these cases, we will compare amenability determinations to the types of proceedings considered by earlier cases, as well as to the sentencing scheme that was evaluated in *Ice* itself.

**{28}**    In *Ice*, the Supreme Court of the United States considered consecutive and concurrent sentencing and concluded that such a determination has been traditionally the province of the trial judge.  129 S. Ct. at 717-18.  The *Ice* Court explained that concurrent and consecutive sentencing involves discrete sentences for multiple offenses, and there was no question that the jury found the facts necessary to impose the sentences related to each of the multiple offenses.  *See id.* at 714.  The only issue was whether the trial court had the discretion to find facts that would cause those sentences to run consecutively, rather than

10

simultaneously.

**{29}** In another context, this Court has considered whether a hearing to determine whether a defendant is competent to stand trial requires the jury protections afforded by *Apprendi*. *State v. Flores*, 2005-NMCA-135, ¶¶ 36-39, 138 N.M. 636, 124 P.3d 1175. "Competency" is defined as "[a] criminal defendant's ability to stand trial, measured by the capacity to understand the proceedings, to consult meaningfully with counsel, and to assist in the defense." *Black's Law Dictionary* 302 (8th ed. 2004). The *Flores* Court explained that (1) competency is not an element of an offense and (2) a competency determination does not enhance or increase a defendant's sentence. 2005-NMCA-135, ¶ 39. Therefore, *Apprendi* was not triggered. *Flores*, 2005-NMCA-135, ¶ 39.

**{30}** The *Ring* Court considered whether a jury was required to find facts supporting an aggravating factor that would have increased the defendant's statutory sentence from life imprisonment to the death penalty. 536 U.S. at 588-89, 597. An "aggravating" circumstance or factor is "[a] fact or situation that increases the degree of liability or culpability for a criminal act." *Black's Law Dictionary*, *supra*, at 259. The *Ring* Court stated that the statutory aggravating factors "operate as 'the functional equivalent of an element of a greater offense,'" and as a result, "the Sixth Amendment requires that they be found by a jury." 536 U.S. at 609 (quoting *Apprendi*, 530 U.S. at 494 n.19 (describing an increase beyond the maximum authorized statutory sentence)). As a result, the Court applied the reasoning of *Apprendi* to the facts of the case. *Ring*, 536 U.S. at 609; *see Cunningham*, 549 U.S. at 274-75 (applying *Apprendi* to aggravating circumstances in noncapital cases).

**{31}** In our view, the present case is distinguishable from *Ice* and *Flores*. In *Ice*, the jury found the facts that supported the charged offenses and imposed sentence for each offense. 129 S. Ct. at 715-16. The only determination for the trial court was the manner in which those sentences would be served. In the present case, Child did not plead to the facts that would support an adult sentence—those additional facts were reserved for determination in an amenability hearing. *See Cunningham*, 549 U.S. at 290 ("If the jury's verdict alone does not authorize the sentence, if, instead, the judge must find an additional fact to impose the longer term, the Sixth Amendment requirement is not satisfied."). The competency determination in *Flores* was designed to determine the defendant's ability to stand trial for the charged crimes. Such a proceeding has no bearing on the facts necessary to convict the defendant or impose a sentence. We are thus unpersuaded that an amenability hearing can reasonably be compared to consecutive or concurrent sentencing or to competency proceedings.

**{32}** Turning to the analysis in *Ring*, a finding of non-amenability may have the same effect as an aggravating factor: to increase the defendant's degree of criminal liability from a juvenile sanction to an adult sentence. Whereas the jury found all of the necessary facts to impose a particular sentence in *Ice*, an amenability determination adds to the accumulation of facts necessary to impose a sentence. Sentencing is not possible until the amenability hearing has been conducted. Thus, amenability findings "operate as the functional equivalent of an element of a greater offense." *Ring*, 536 U.S. at 609 (internal quotation marks and citation omitted).

11

**{33}** Comparing the types of proceedings, we conclude that amenability findings are similar to aggravating factors and, as such, are within the jury's exclusive province. *See Ice*, 129 S. Ct. at 716-17 (assigning "certain facts to the jury's exclusive province" under *Apprendi* and acknowledging that *Apprendi* applies to *Cunningham*); *Cunningham*, 549 U.S. at 288 (applying *Apprendi* to aggravating factors). Because we are satisfied that the holding in *Ice* does not prevent the application of *Apprendi*, we consider whether there is sufficient basis to overrule *Gonzales*.

**5.     *Gonzales***

**{34}** In *Gonzales*, this Court was directly confronted with the question in the present case: whether the State is required to prove the Section 32A-2-20(B) findings "to a jury beyond a reasonable doubt before a court may exercise its discretion to sentence a child as an adult." 2001-NMCA-025, ¶ 1. This Court held that *Apprendi* did not require a jury determination of amenability. *Gonzales*, 2001-NMCA-025, ¶ 1. In order to justify departing from a prior holding, a number of factors may be material:

> 1) whether the precedent is so unworkable as to be intolerable; 2) whether parties justifiably relied on the precedent so that reversing it would create an undue hardship; 3) whether the principles of law have developed to such an extent as to leave the old rule no more than a remnant of abandoned doctrine; and 4) whether the facts have changed in the interval from the old rule to reconsideration so as to have robbed the old rule of justification.

*State v. Martinez*, 2006-NMSC-007, ¶ 28, 139 N.M. 152, 130 P.3d 731 (internal quotation marks and citation omitted). We consider only the third factor to be relevant to our current analysis and evaluate *Gonzales* in light of that one factor.

**{35}** The *Gonzales* Court provided three bases for its holding:  (1) amenability proceedings do not increase the maximum penalty for a youthful offender, 2001-NMCA-025,  ¶¶ 31, 68; (2) amenability does not relate to culpability, *id.* ¶ 24; and (3) amenability is a predictive determination, which is not well suited for jury consideration, *id.* ¶ 28. We consider each point in order to determine whether the law has changed sufficiently to require a departure from *Gonzales*.

**a.     Maximum Sentence**

**{36}** *Gonzales* questioned whether the amenability determination actually had the effect of imposing greater punishment than the statutory maximum. This Court focused on the time of the plea bargain and noted that once an offender has notice that he has been categorized as a youthful offender, the maximum sentence is the mandatory adult sentence. *Id.* ¶ 31. In this respect, the amenability findings were not the determinative factors that led to the adult sentence. *Id.* Instead, the initial categorization of the offender as a youthful offender broadened the range of sentences to include the maximum adult sentence. *Id.* Thus, a determination that an offender is not amenable to treatment does not result in a sentence that is greater than the statutory maximum, and *Apprendi* is not implicated. *See*

*Apprendi*, 530 U.S. at 481 ("We should be clear that nothing in this history suggests that it is impermissible for judges to exercise discretion—taking into consideration various factors relating both to offense and offender—in imposing a judgment *within the range* prescribed by statute.").

**{37}** The Supreme Court of the United States, however, has since defined "'statutory maximum' for *Apprendi* purposes [as] the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant." *Blakely*, 542 U.S. at 303 (emphasis omitted). It thus appears that the statutory maximum is not based on the maximum sentence of which a defendant has notice, whether by way of a plea agreement or by statute. Instead, the statutory maximum is the maximum sentence that is supported by the facts found by the jury or pleaded to by the defendant. This conclusion is further borne out by *Cunningham*.

**{38}** As we have described, in *Cunningham*, the defendant was convicted of an offense that was punishable by imprisonment for either six, twelve, or sixteen years. 549 U.S. at 275. The jury's verdict supported the imposition of the twelve-year sentence, but the trial court found additional facts and sentenced the defendant to sixteen years. *Id.* at 275-76. The *Cunningham* Court concluded that the trial court did not have the "discretion to select a sentence within a range of [six] to [sixteen] years." *Id.* at 273, 292. The trial court was instead required to "select [twelve] years, nothing less and nothing more, unless he found facts allowing the imposition of a sentence of [six] or [sixteen] years." *Id.* at 292. Because state law authorized "the judge, not the jury, to find the facts permitting an upper[-]term sentence," the *Cunningham* Court held that California's system violated the Sixth Amendment. *Id.* at 293.

**{39}** Section 32A-2-20(A) states that "[t]he court has the discretion to invoke either an adult sentence or juvenile sanctions on a youthful offender." Similar to *Cunningham*, the trial court does not have a range of available sentences between the minimum juvenile sanction to the maximum adult sentence. Instead, the trial court may choose to apply either the juvenile sentence or the adult sentence—but in order to apply the adult sentence, the trial court is required to make additional factual findings to determine whether the offender is amenable to treatment or eligible for commitment. *See* § 32A-2-20(B). This is exactly the scenario that the United States Supreme Court rejected in *Cunningham*.

**{40}** The State argues that Section 32A-2-20(B) does not increase the sentence for any offense, but instead permits the trial court to reduce the sentence of a youthful offender, based on his status as a juvenile. To use the aggravated battery charge as an example, Child was charged using the same statute under which an adult would have been charged, and he was sentenced as an adult to three years in prison for that charge. Under the Delinquency Act, for the same crime, Child would have been committed to "a facility for the care and rehabilitation of adjudicated delinquent children" until the age of twenty-one. Sections 32A-2-19(B)(1)(a), -20(F). The State essentially argues that the sentence attaches to the elements of the crime charged, that Child pled to the elements of the crime, and therefore he pled to the facts necessary to impose the adult sentence, thus eliminating any *Apprendi* difficulty. The availability of a juvenile sentence under the Delinquency Act, the State contends,

13

"simply confers a statutory benefit on juveniles found guilty beyond a reasonable doubt of committing a crime."  We disagree.

**{41}**   The purpose of the Delinquency Act is to

> remove from children committing delinquent acts the adult consequences of criminal behavior, but to still hold children committing delinquent acts accountable for their actions to the extent of the child's age, education, mental and physical condition, background and all other relevant factors, and to provide a program of supervision, care and rehabilitation, including rehabilitative restitution by the child to the victims of the child's delinquent act to the extent that the child is reasonably able to do so[.]

Section 32A-2-2(A).  A "delinquent act" is defined as "an act committed by a child that would be designated as a crime under the law if committed by an adult."  Section32A-2-3(A).  A "delinquent child" is "a child who has committed a delinquent act."  Section 32A-2-3(B).  And a youthful offender—subject to either adult or juvenile sanctions—maintains his classification as a "delinquent child."  Section 32A-2-3(I).

**{42}**   The Legislature has thus removed children from the basic criminal scheme, first by expressing an intent not to impose adult consequences and second, by differentiating an act committed by a child from a crime committed by an adult, even if it is the very same act. It is apparent that although the Delinquency Act uses the same statutes to define crimes that are used to convict adults, the Delinquency Act is a separate system designed to rehabilitate juvenile offenders.  *See Gault*, 387 U.S. at 15-16 ("The child was to be 'treated' and 'rehabilitated' and the procedures, from apprehension through institutionalization, were to be 'clinical' rather than punitive."); *Kent*, 383 U.S. at 560-61 ("[I]t is implicit in [a juvenile] scheme that non-criminal treatment is to be the rule—and the adult criminal treatment, the exception which must be governed by the particular factors of individual cases." (first alteration in original) (internal quotation marks and citation omitted)); *see also* § 32A-2-6(B) (providing the trial court with exclusive jurisdiction under the Delinquency Act over a defendant under the age of eighteen who is charged with a delinquent act).

**{43}**   The State argues that we should define the basic sentence for *Apprendi* purposes as that determined by the statute delineating the charged crime—in the criminal code. Youthful offenders, however, are tried and sentenced entirely under the Delinquency Act.  *See* § 32A-2-6.  Under Section 32A-2-20(B) and (C), the juvenile sentence is the baseline sentence because the adult sentence is available only if the court makes the required factual findings. *See* § 32A-2-20(B) (stating that "the court shall make the following findings in order to invoke an adult sentence").  As a result of the language of the statute, the State's argument that the adult definition of a crime determines the basic sentence for a juvenile found guilty of that crime must fail.

**{44}**   The State also argues that because the adult sentence is not always greater than the juvenile sentence, "the application of *Apprendi* becomes arbitrary and wholly unrelated to the circumstances or facts of a juvenile's crimes."  Specifically, the State again points to a

juvenile's conviction for aggravated battery.  Without the firearm enhancement, the adult sentence for this crime is three years in prison.  *See* § 30-3-5(C) (aggravated battery is a third degree felony); NMSA 1978, § 31-18-15(A)(9) (2005) (amended 2007) (third degree felonies are subject to three years' imprisonment).  Under the Delinquency Act, a juvenile who was seventeen at the time of the battery would have been subject to a commitment of more than three years, until he turned twenty-one.  *See* § 32A-2-20(F).  Under those circumstances, an adult sentence for aggravated battery would have been *less* than the juvenile sanction.

**{45}**    We acknowledge that *Apprendi* is only concerned with sentences that exceed the sentence authorized by a jury's verdict or a plea agreement.  *Blakely*, 542 U.S. at 303.  Nevertheless, the facts of the case before us now involve a three-and-one-half-year juvenile sanction as opposed to a twenty-five-year adult sentence.  We therefore do not consider the case in which the length of the juvenile sanction exceeds the length of the adult sentence.

**{46}**    Accordingly, we conclude that (1) the maximum sentence is determined by the facts in the jury's verdict or a plea agreement and not by the range of sentences available in the statute, and (2) a youthful offender's sentence is first determined by the Delinquency Act and not the criminal code.  Finally, it is reasonable for the trial court to determine whether the adult sentence for a charged crime will be greater than the juvenile sentence in order to assess who will make the findings under Section 32A-2-20(B)—a jury or the trial court.

### b.    Culpability

**{47}**    The *Gonzales* Court also observed that an amenability determination is distinct from findings of fact related to the elements of the crime.  2001-NMCA-025, ¶ 24.  "[W]hile findings of guilt are measures of the degree of an individual's criminal culpability, the finding that a child is or is not amenable to treatment is a measure of a child's prospects for rehabilitation."  *Id.*  Thus, any due process concerns raised by *Apprendi* were satisfied by a "jury's finding beyond a reasonable doubt that a child committed the offenses that form the foundation permitting the court to sentence the child as an adult."  *Gonzales*, 2001-NMCA-025, ¶ 25.  The State agrees with this reasoning.  After considering *Ring* and *Frawley*, we cannot.

**{48}**    The *Ring* Court, considering the imposition of the death penalty based on aggravating factors, concluded that "[i]f a [s]tate makes an increase in a defendant's authorized punishment contingent on the finding of a fact, that fact—no matter how the [s]tate labels it—must be found by a jury beyond a reasonable doubt."  536 U.S. at 588, 602.  Our Supreme Court came to a similar conclusion regarding aggravating factors in *Frawley*, 2007-NMSC-057.  There, the issue was whether a noncapital sentence had been unconstitutionally altered upward without a jury determination of aggravating circumstances—circumstances apart from the elements of the offense.  *Id.* ¶¶ 1, 22.  The *Frawley* Court observed that "[a] sentencing judge may exercise discretion to increase the basic sentence only after the judge finds aggravating circumstances."  *Id.* ¶ 22.  Because it was undeniable that the "law *forbids* a judge to increase a defendant's sentence *unless* the judge finds facts that the jury did not find (and the offender did not concede), *Frawley* concluded that "the Sixth Amendment is

15

violated *any time* a defendant is sentenced above what is authorized *solely* by the jury's verdict alone." *Id.* ¶ 23. Looking to Section 32A-2-20(B), the Legislature has made the imposition of an adult sentence on a youthful offender contingent on additional findings of fact—findings that are apart from those necessary to adjudicate guilt. *See Cunningham*, 594 U.S. at 288 (explaining that an "[a]n element of the charged offense, essential to a jury's determination of guilt, or admitted in a defendant's guilty plea" does not constitute an aggravating factor and that aggravating factors cannot contribute to the statutory maximum).

**{49}** In order to invoke the adult sentence, the trial court "shall make the following findings," including whether an offender is amenable to treatment and whether the offender is eligible for commitment to an institution. Section 32A-2-20(B). In order to make those determinations, the trial court is directed to consider a number of factors, including the circumstances of the incident, the offender's level of intent, personal attributes and history of the offender, as well as "any other relevant factor, provided that factor is stated on the record." Section 32A-2-20(C). Accordingly, an adult sentence cannot be invoked, and the juvenile sanction automatically applies unless the trial court makes the requisite findings. *See* NMSA 1978, § 12-2A-4(A) (1997) ("'Shall' and 'must' express a duty, obligation, requirement or condition precedent."). The fact that an amenability determination is apart from the elements of the charged crime has no bearing on whether *Apprendi* applies because the additional facts necessary to determine whether a youthful offender is amenable to treatment have the potential to increase the offender's sentence.

**{50}** *Gonzales* also noted that the *Apprendi* Court "distinguished its holding from cases dealing with fact-finding in capital sentencing on the grounds that it is the jury's verdict of guilty of first degree murder that exposes a defendant to the possibility of a death sentence." *Gonzales*, 2001-NMCA-025, ¶ 29. The United States Supreme Court has since rejected this interpretation of *Apprendi* and held that juries are required to determine the additional facts—aggravating circumstances—that expose a defendant to the death penalty. *See Ring*, 536 U.S. at 588-89.

### c. Predictive Determination

**{51}** The *Gonzales* Court further reasoned that "while findings of guilt are based on historical facts susceptible of proof beyond a reasonable doubt, a finding that a child is not amenable to rehabilitation requires a prediction of future conduct based on complex considerations of the child, the child's crime, and the child's history and environment." 2001-NMCA-025, ¶ 24. This Court compared amenability findings to the findings necessary for civil commitment and determined that a trial court, rather than a jury, is in a better position to determine the amenability of a particular child. *Id.* ¶¶ 27-28.

**{52}** Since *Gonzales*, the United States Supreme Court has made clear that the right to a jury trial is not tied to the proficiency of the fact finder. The right

> does not turn on the relative rationality, fairness, or efficiency of potential factfinders. Entrusting to a judge the finding of facts necessary to support a death sentence might be an admirably fair and efficient scheme of criminal

16

justice designed for a society that is prepared to leave criminal justice to the [s]tate. . . . The founders of the American Republic were not prepared to leave it to the [s]tate, which is why the jury-trial guarantee was one of the least controversial provisions of the Bill of Rights. It has never been efficient; but it has always been free.

*Ring*, 536 U.S. at 607 (alterations in original) (internal quotation marks and citation omitted). Further, we are hesitant to compare amenability determinations to civil commitment proceedings. Although both proceedings are prospective and consider the subject's future actions and abilities, a civil commitment proceeding does not have an effect on a criminal sentence. *Compare Black's Law Dictionary*, *supra*, at 1393 (defining "sentence" as "[t]he judgment that a court formally pronounces after finding a criminal defendant guilty"), *with id.* at 262 (defining a "civil commitment" proceeding as the "commitment of a person who is ill, incompetent, drug-addicted, or the like, as contrasted with a criminal sentence"). Civil commitment proceedings are unrelated to criminal prosecutions for existing charges and therefore, do not implicate the same constitutional rights.

### d.      Viability of *Gonzales*

**{53}** Having reviewed *Gonzales*, we can no longer rely on its underpinnings to support the holding that *Apprendi* does not apply to amenability hearings conducted under Section 32A-2-20(B). When the adult sentence for a charged crime is greater than the basic juvenile sanction for a youthful offender, amenability determinations have the effect of increasing the offender's sentence based on facts other than those necessary for the verdict. Section 32A-2-20(B) and (C) dictate that the trial court is responsible for finding those additional facts and according to the *Apprendi* line of cases, such a determination must be made by a jury. Because the statute requires the trial court to find these additional facts, we must conclude that Section 32A-2-20(B) and (C) are facially unconstitutional. *See Frawley*, 2007-NMSC-057, ¶ 29. We further hold that our holding is a new rule, *id.* ¶ 35 (defining a "new rule" as a decision that is an "explicit overruling of an earlier holding" (internal quotation marks and citation omitted)), and that the rule should only be applied prospectively. *See id.* ¶¶ 38-44 (explaining that because a new rule affecting only sentencing, and not conviction, is a procedural rule and because judicial factfinding does not seriously diminish accuracy, the *Frawley* rule would apply only prospectively). As such, the rule will apply only to new cases and those that are on direct review where the *Apprendi* issue has been preserved for appeal. *See id.* ¶ 34.

**{54}** We remand the matter for Child to be resentenced. *See id.* ¶¶ 33, 45 (declining to construct a remedy for the statute that the appellate court held to be unconstitutional under *Apprendi* because "[t]he issue has not been adequately briefed and the question of how to ultimately fix the constitutional problem lies with the Legislature"). We observe that *Frawley* was decided on October 25, 2007, and in 2009, the Legislature amended Section 31-18-15.1 to require a jury determination of whether aggravating circumstances exist unless a defendant has waived this right. Section 31-18-15.1, as amended by 2009 N.M. Laws ch. 163, § 1 (effective July 1, 2009).

**B.      Evidence Supporting the Amenability Determination**

**{55}**    Because we have remanded the matter for resentencing, we do not reach Child's argument regarding the sufficiency of the evidence to support the amenability determination.

**C.      Double Jeopardy**

**{56}**    Child also argues that his convictions for shooting at a motor vehicle resulting in great bodily harm and aggravated battery resulting in great bodily harm are a violation of the prohibition against double jeopardy.  The State cites *State v. Dominguez*, 2005-NMSC-001, 137 N.M. 1, 106 P.3d 563, arguing that our Supreme Court has already concluded that convictions under these statutes do not violate double jeopardy.  We agree with the State.

**{57}**    The United States Constitution prohibits the states from twice exposing a citizen to punishment for the same offense.  *See id.* ¶ 5.  Double jeopardy protects against both multiple prosecutions for the same offense and multiple punishments for the same course of conduct.  *See id.*  Child contends that his convictions amount to multiple punishments for a single act—shooting at the victims' car.  In order to determine whether the convictions violate double jeopardy, we evaluate two factors:  (1) whether the conduct was unitary and (2) whether the Legislature intended to create separately punishable offenses.  *Id.*

**{58}**    In *Dominguez*, the defendant was convicted of aggravated battery and shooting at or from a motor vehicle.  *Id.* ¶ 17.  There was no dispute that the involved conduct—shooting from a vehicle—was unitary, and the *Dominguez* Court focused on the Legislature's intent. *See id.* ¶¶ 17-18.  The Court first concluded that each of the crimes included an element that the other crime did not:  aggravated battery required the intent to injure and shooting at or from a motor vehicle required the discharge of a firearm at or from a vehicle.  *Id.* ¶ 18.  Based on this, the Court acknowledged a presumption that the Legislature intended for these two crimes to be separately punishable.  *Id.*

**{59}**    Next, the Court considered the different social goals of the two crimes and concluded that the aggravated battery statute was designed to protect against bodily injury, while the shooting at or from a motor vehicle statute is meant to protect the public from "reckless shooting at or from a vehicle."  *Id.* ¶ 19.  Further, the Court noted that it was possible to commit one of the crimes without committing the other.  *Id.* ¶ 20.  Firing a gun at or from a vehicle could be accomplished absent the intent to injure another person, even if the discharge of the weapon ultimately causes great bodily harm.  *Id.*  And, "of course, [there are] a multitude of ways to commit aggravated battery without the involvement of a motor vehicle."  *Id.*

**{60}**    Child characterizes his convictions as aggravated battery resulting in great bodily harm and shooting at or from a vehicle resulting in great bodily harm and argues that "it would be impossible for [Child] to commit the shooting at a motor vehicle resulting in great bodily harm without also committing an aggravated battery resulting in great bodily harm."  We disagree.  Child's convictions were for shooting at a motor vehicle resulting in great bodily harm and aggravated battery with a deadly weapon.  Nothing about these charges

18

changes the analysis conducted by our Supreme Court in *Dominguez*: each crime includes at least one different element, the social goals of the two crimes are different, and it is possible to commit one crime without committing the other. Even though Child's firing of the weapon at or from the vehicle resulted in great bodily harm, the State was not required to prove that Child had the intent to injure the victim. It was also possible to commit the aggravated battery, even with a deadly weapon, without the use of a vehicle. We therefore conclude that *Dominguez* controls, and Child's convictions do not violate double jeopardy.

**III.    CONCLUSION**

**{61}**    We reverse the trial court's amenability findings and remand for Child to be resentenced. We affirm Child's convictions for aggravated battery with a deadly weapon and shooting at or from a motor vehicle resulting in great bodily harm.

**{62}    IT IS SO ORDERED.**

_____
**CELIA FOY CASTILLO, Judge**

**I CONCUR:**

_____
**CYNTHIA A. FRY, Chief Judge**

**JONATHAN B. SUTIN, Judge (specially concurring)**

**SUTIN, Judge (specially concurring).**

**{63}**    I concur in the result. I write separately because I do not agree with the rationale employed by the majority in applying *Apprendi*, 530 U.S. 466, and its progeny as controlling precedent. I think that the case should be remanded for further development of acceptable rationales for requiring jury consideration of the amenability factors or, barring remand, should be certified to our Supreme Court for consideration of rationales I discuss in this separate opinion.

**{64}**    The majority relies on *Apprendi* as applicable and controlling precedent. *Apprendi* is grounded in the Sixth and Fourteenth Amendments. The majority is therefore holding that the Sixth Amendment, together with the Fourteenth Amendment, requires the amenability factors to be determined by a jury beyond a reasonable doubt (1) upon adjudication of a juvenile as a youthful offender by the children's court under the Children's Code, and (2) upon the children's court's decision as permitted under the Children's Code to invoke an adult sentence on the youthful offender. This process from beginning to end is a children's court adjudicatory process that is separate and distinct from the adult criminal process. *See* NMSA 1978, § 32A-1-1 (1995) (naming Chapter 32A NMSA as the "Children's Code"); NMSA 1978, § 32A-1-4(C) (2003) (amended 2005 and 2009) (defining the children's court); NMSA 1978, § 32A-1-5 (1993) (establishing the children's court); §§ 32A-2-19, -20 (relating to adjudication of delinquent offenders as youthful offenders and

19

to disposition of youthful offenders). Yet, as the majority opinion acknowledges, *McKeiver*, 403 U.S. at 545, says that the Sixth Amendment right to a jury trial does not extend to such juvenile adjudicatory processes. Therefore, in my view, *Apprendi* is not controlling based on the rationale set out in the majority opinion. The majority applies *Apprendi* specifically to adjudications of youthful offenders in separate and distinct juvenile proceedings based on *Apprendi*'s Sixth Amendment foundation, even though under *McKeiver*, the Sixth Amendment right to a jury trial does not extend to those very youthful offender, juvenile proceedings.

{65}    I have no problem applying *Apprendi* under a different rationale. Namely, as here, when a juvenile is placed at risk of being treated as an adult who has been convicted of a felony subject to adult punishment, the Sixth Amendment is applicable because, in reality, the juvenile is treated as though he is an adult who is protected under the Sixth Amendment. Nor do I have a problem applying *Apprendi's* due process analyses in favor of jury consideration of the factors even if the Sixth Amendment is not applicable under any rationale, because New Mexico constitutionally and statutorily grants juveniles the right to a jury trial, and also constitutionally grants juveniles due process of law. *See* N.M. Const. art. II, §§ 12, 18; *Peyton*, 78 N.M. at 723, 437 P.2d at 722 (stating that juveniles charged with a felony are guaranteed a jury trial in New Mexico under the New Mexico Constitution). Thus, based on reasoning parallel to *Apprendi*'s federal constitutional law analysis, and under our state constitutional and statutory right to a jury trial and our state due process protections, the State is required to abide by the view that "any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi*, 530 U.S. at 489-90; *Evitts v. Lucey*, 469 U.S. 387, 400-02 (1985) (indicating that where the right to effective assistance of counsel is granted by the state, procedures used and decisions made on the issue must accord with due process); *cf. In re L.M.*, 186 P.3d 164, 170 (Kan. 2008) (determining that *McKeiver* was no longer applicable to the Kansas juvenile system, concluding "that the Kansas juvenile justice system has become more akin to an adult criminal prosecution," and holding "that juveniles have a constitutional right to a jury trial under the Sixth and Fourteenth Amendments"); *Commonwealth v. Quincy Q.*, 753 N.E.2d 781, 788-90 (Mass. 2001) (holding that juveniles have a right to a jury determination of the facts supporting the imposition of an adult sentence), *overruled on other grounds by Commonwealth v. King*, 834 N.E.2d 1175 (Mass. 2005).

{66}    The parties did not raise these rationales below or in this Court. These rationales should be aired, given the fact that *Apprendi*, which indisputedly relies on a Sixth Amendment right to a jury trial, cannot in the face of *McKeiver* be rationally applied to youthful-offender adjudications in Children's Code adjudicatory proceedings unless it is applied under a rationale that the Sixth Amendment protects a juvenile who is placed at risk of being treated as an adult who has been convicted of a felony subject to adult punishment. I would prefer that the case be remanded for development of these issues or certified to the Supreme Court for its consideration either under that Court's apparent inherent discretion to consider argument and authority not presented in the district court or in this Court, or after receiving additional briefing.

20

**{67}**    One final matter:  I agree that the decisions in the transfer cases discussed in the majority opinion at pages 19-20 should not be instructive or followed.  I would not, however, attempt to distinguish them as does the majority on the basis of any concept of jurisdiction or for that matter on any rationale other than that the cases were not correctly decided.  *See* Jenny E. Carroll, *Rethinking the Constitutional Criminal Procedure of Juvenile Transfer Hearings:*  Apprendi*, Adult Punishment and Adult Process*, 61 Hastings L.J. (forthcoming 2009); Vannella, *supra*, at 755-70.  The correct disposition is that when, as in New Mexico, the juvenile adjudicatory process places a juvenile at risk of being treated as an adult convicted of a felony and subject to adult punishment, the Sixth Amendment should be applicable.  This, in turn, brings *Apprendi* back into play.

_____

**JONATHAN B. SUTIN, Judge**

**Topical Index for *State v. Rudy B.*, No. 27,589**

| | |
|---|---|
| **CD** | **CHILDREN** |
| CD-CC | Children's Code |
| CD-CR | Children's Court |
| CD-ST | Sentencing |
| | |
| **CA** | **CRIMINAL PROCEDURE** |
| CA-JS | Judgment and Sentence |
| CA-RJ | Right to Trial by Jury |
| | |
| **CL** | **CRIMINAL LAW** |
| CL-AG | Aggravating or Mitigating Circumstances |
| CL-BA | Battery |
| CL-ST | Shooting Offences |
| CL-WO | Weapons Offences |
| | |
| **CT** | **CONSTITUTIONAL LAW** |
| CT-DJ | Double Jeopardy |
| CT-TJ | Trial by Jury |