IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

Opinion Number: 2010-NMSC-045

Filing Date: October 19, 2010

Docket No. 31,909

STATE OF NEW MEXICO,

Plaintiff-Petitioner,

v.

RUDY B.,

Defendant-Respondent.

ORIGINAL PROCEEDING ON CERTIORARI
Monica M. Zamora, District Judge

Gary K. King, Attorney General
M. Victoria Wilson, Assistant Attorney General
Santa Fe, NM

for Petitioner

Hugh W. Dangler, Chief Public Defender
J.K. Theodosia Johnson, Assistant Appellant Defender
Santa Fe, NM

for Respondent

Marsha L. Levick
Katherine E. Burdick
Philadelphia, PA

for Amici Curiae, Juvenile Law Center,
Children's Law Center of Massachusetts,
Juvenile Justice Project of Louisiana,
National Juvenile Defender Center,
New Mexico Criminal Defense Lawyers Association,
Southern Juvenile Defender Center, and
Professor Barbara Fedders

1

**OPINION**

**BOSSON, Justice.**

**{1}**     New Mexico law requires a trial judge to hold an evidentiary hearing to determine whether a juvenile, adjudicated as a youthful offender for having committed certain serious criminal offenses, is "amenable" to treatment or rehabilitation in juvenile facilities or should be sentenced to prison as an adult.  *See* NMSA 1978, § 32A-2-20 (1993) (amended 2009). Our courts have labored for years debating whether the Sixth Amendment right to a jury trial requires the amenability determination to be made by the jury or by the trial judge as the statute provides.  *See State v. Gonzales*, 2001-NMCA-025, 130 N.M. 341, 24 P.3d 776, *overruled by State v. Rudy B.*, 2009-NMCA-104, ¶ 53, 147 N.M. 45, 216 P.3d 810.

**{2}**     On the basis of U.S. Supreme Court precedent recently issued in *Oregon v. Ice*, _ U.S. ___, 129 S. Ct. 711 (2009), we now conclude that the Sixth Amendment does not require a jury determination, and thus, we uphold from constitutional challenge New Mexico's statutory preference for judge-made amenability decisions. In so doing, we reverse the recent contrary opinion of our Court of Appeals and remand for further proceedings.

**BACKGROUND**

**{3}**     The Court of Appeals succinctly described the events resulting in the prosecution of Rudy B. ("Child") in this case.  "Child was involved in a gang fight in a parking lot.  Under the impression that one of the other gang members had a gun, Child pulled out his own weapon and began shooting.   He hit three people, one of whom was rendered a quadriplegic." *Rudy B*., 2009-NMCA-104, ¶ 2.

**{4}**     The State then filed a petition in children's court against Child, seventeen years old at the time, alleging various youthful offender offenses and potentially subjecting him to an adult sentence.  Soon thereafter, the State filed notice of its intent to seek adult sanctions and obtained a grand jury indictment, charging Child with three counts of shooting from a motor vehicle (great bodily harm), three counts of aggravated battery (deadly weapon), and one count of unlawful possession of a handgun by a minor, and one count of tampering with evidence.  Prior to trial, Child pleaded guilty to two counts of shooting from a motor vehicle (great bodily harm) and to two counts of aggravated battery (deadly weapon) (firearm enhancement).  In return, the State agreed to drop the remaining charges.

**{5}**     The plea agreement specified that Child was to be sentenced after an amenability hearing that would be held "pursuant to [Section] 32A-2-20."  Section 32A-2-20 requires a trial judge to hold an evidentiary hearing to determine whether a juvenile adjudicated as a youthful offender should be sentenced as a juvenile or as an adult.  To sentence a youthful offender as an adult, the trial judge must make two findings (collectively "the amenability determination"):  "(1) the child is not amenable to treatment or rehabilitation as a child in available facilities; and (2) the child is not eligible for commitment to an institution for

children with developmental disabilities or mental disorders." Section 32A-2-20(B). The statute provides a list of factors for the trial judge to consider in light of the evidence presented at the amenability proceeding. Section 32A-2-20(C).[1]

**{6}** Child's agreement further explained that, depending on the outcome of the amenability proceeding, he faced either a juvenile disposition until the age of twenty-one with the Children, Youth & Families Department, or an adult sentence of up to twenty-six years with the Department of Corrections. The agreement also contained a provision in which Child waived "all motions, defenses, objections, or requests" regarding the judgment against him, and "specifically waive[d] his right to appeal as long as the Court's sentence [was] imposed according to the terms of [the] agreement."

**{7}** At the amenability hearing, the trial judge heard conflicting evidence regarding Child's amenability to treatment or rehabilitation as a juvenile in available facilities. At the conclusion of the hearing, the trial judge explained that her decision as to Child's amenability would turn primarily on "the prospects for adequate protection of the public and the likelihood of reasonable rehabilitation of the child by the use of procedures, services and facilities currently available," given that Child was eighteen at the time of the hearing. Section 32A-2-20(C)(7). She further explained that the parties had not done an adequate job of educating her regarding the programs and facilities available to treat or rehabilitate Child

---

[1]Section 32A-2-20 provides, in relevant part,

      C.    In making the findings set forth in Subsection B of this section, the judge shall consider the following factors:

          (1)    the seriousness of the alleged offense;

          (2)    whether the alleged offense was committed in an aggressive, violent, premeditated or willful manner;

          (3)    whether a firearm was used to commit the alleged offense;

          (4)    whether the alleged offense was against persons or against property, greater weight being given to offenses against persons, especially if personal injury resulted;

          (5)    the maturity of the child as determined by consideration of the child's home, environmental situation, social and emotional health, pattern of living, brain development, trauma history and disability;

          (6)    the record and previous history of the child;

          (7)    the prospects for adequate protection of the public and the likelihood of reasonable rehabilitation of the child by the use of procedures, services and facilities currently available; and

          (8)    any other relevant factor, provided that factor is stated on the record.

by the time he reached twenty-one. Because the trial judge felt incapable of rendering an informed decision, she deferred her ruling on Child's amenability until the parties could present additional evidence regarding the available treatment or rehabilitation options.

**{8}** Based on the evidence presented at a subsequent hearing, the trial judge concluded that no suitable facilities or services were available to treat or rehabilitate Child to a level that would adequately protect the public by the time he turned twenty-one. Consequently, the judge found that Child was not amenable to treatment or rehabilitation as a child in available facilities, and that he was not eligible for commitment to an institution for children with developmental disabilities or mental disorders. The judge imposed an adult sentence of twenty-five years imprisonment with the Department of Corrections.

**{9}** On appeal, our Court of Appeals reversed, holding Section 32A-2-20(B) and (C) facially unconstitutional because its amenability determination was made by a judge and not the jury. *Rudy B.*, 2009-NMCA-104, ¶ 53. In so doing, the Court relied on a string of Sixth Amendment decisions of the U.S. Supreme Court reaching back to *Apprendi v. New Jersey*, 530 U.S. 466 (2000). *Rudy B.*, 2009-NMCA-104, ¶¶ 15-19. The Court overruled its prior opinion in *Gonzales*, 2001-NMCA-025, which had arrived at the opposite conclusion with regard to these same amenability determinations. *See Rudy B.*, 2009-NMCA-104, ¶¶ 34-35, 53. We granted certiorari to address important and timely constitutional issues under the Sixth Amendment as they affect our statutory process for adjudicating juveniles charged with serious criminal offenses. *See State v. Rudy B.*, 2009-NMCERT-009, 147 N.M. 423, 224 P.3d 650.

**DISCUSSION**

**{10}** The State raises two issues on appeal. First, the State contends that the Court of Appeals did not have jurisdiction to consider Child's constitutional challenge to Section 32A-2-20 because Child waived his right to appeal in the plea agreement. Second, the State argues that the Court of Appeals erred when it declared Section 32A-2-20 unconstitutional, largely because it improperly applied the U.S. Supreme Court's recent opinion in *Ice*, __ U.S. __, 129 S. Ct. 711. We address each argument in turn.

**The Court of Appeals had jurisdiction over this case.**

**{11}** The State maintains that Child's explicit waiver of his right to appeal divested the Court of Appeals of jurisdiction to consider his constitutional challenge to Section 32A-2-20. The State's argument is essentially that appellate jurisdiction rests on the status of an appellant as an "aggrieved party," and that Child "agreed not to be aggrieved" when he waived his right to appeal. *See* N.M. Const. art. VI, § 2 ("[A]n aggrieved party shall have an absolute right to one appeal."). We find the jurisdictional argument unpersuasive.

**{12}** The State does not cite, and we cannot find, any authority to support the proposition that a *waiver* in a plea agreement of the right to appeal divests the Court of Appeals of

4

*jurisdiction* to hear an appeal in a criminal proceeding. The two cases on which the State relies merely illustrate the well-established principle that a voluntary plea of guilty or *nolo contendere* "'ordinarily constitutes a waiver of the defendant's right to appeal his conviction on other than jurisdictional grounds.'" *State v. Chavarria*, 2009-NMSC-020, ¶ 9, 146 N.M. 251, 208 P.3d 896 (quoting *State v. Hodge*, 118 N.M. 410, 414, 882 P.2d 1, 5 (1994)); *see also id.* (limiting review to the question of whether the trial court had jurisdiction to sentence the defendant to life in prison, rather than reaching the merits of the defendant's Eighth Amendment challenge to his life sentence); *State v. Michael S.*, 1998-NMCA-041, ¶ 11, 124 N.M. 732, 955 P.2d 201 (declining to address the child's substantive appellate arguments because they were not based on jurisdictional grounds). These cases do not hold, however, that such a waiver in a plea agreement divests an appellate court of jurisdiction to entertain that appeal.

**{13}** At bottom, a plea agreement is simply a contract between the State and an accused that affects the rights of the parties but not the court's jurisdiction, which is a creature of statute and the state constitution. *See State v. Simmons*, 2006-NMSC-044, ¶ 12, 140 N.M. 311, 142 P.3d 899 ("We address the plea agreement as a unique form of contract, binding upon both parties, relying on the rules of contract construction."); *State v. Monta ̃no*, 2004-NMCA-094, ¶ 7, 136 N.M. 144, 95 P.3d 1059 ("A plea agreement is a form of contract between the State and a defendant."). A provision of a plea agreement waiving the right to appeal is binding on the parties to the same extent that any contractual provision binds the parties to a particular term of a contract.

**{14}** Subject matter jurisdiction, on the other hand, implicates a court's "power to decide" the issue before it. *State v. Bailey*, 118 N.M. 466, 469, 882 P.2d 57, 60 (Ct. App. 1994). Put another way, "the term 'jurisdictional error' should be confined to instances in which the court was not competent to act." *State v. Orosco*, 113 N.M. 780, 783, 833 P.2d 1146, 1149 (1992). A court's jurisdiction derives from a statute or constitutional provision. *See State v. Smallwood*, 2007-NMSC-005, ¶ 6, 141 N.M. 178, 152 P.3d 821 ("[O]ur Constitution or Legislature must vest us with appellate jurisdiction.").

**{15}** With respect to this case, the Legislature vested the Court of Appeals with subject matter jurisdiction over "criminal actions, except those in which a judgment of the district court imposes a sentence of death or life imprisonment." NMSA 1978, § 34-5-8(A)(3) (1983). Child's waiver of his right to appeal does not transform this proceeding into something other than a "criminal action." Nor did the trial court impose a sentence of death or life imprisonment. Hence, Child's waiver does not implicate the "power" or "competen[ce]" of the Court of Appeals to consider his case.

**{16}** The State did not raise the issue of Child's waiver of his right to appeal to the Court of Appeals, nor did it raise the issue to this Court in its petition for certiorari. Consequently, because this is neither a jurisdictional nor foundational issue that is integral to the resolution of the questions presented in this petition, we do not decide whether the scope of Child's waiver extended to the constitutionality of Section 32A-2-20. *See State v. Javier M.*, 2001-

NMSC-030, ¶ 10, 131 N.M. 1, 33 P.3d 1 (holding that this Court may reach "a foundational issue which is integral to a complete and thorough analysis of the specific question presented in the petition for writ of certiorari"); *see also* Rule 12-502(C)(2)(b) NMRA ("[T]he Court will consider only the questions set forth in the petition . . . ."). Therefore, we reject the State's invitation to reverse the Court of Appeals on jurisdictional grounds and proceed to the significant constitutional issue presented in Child's certiorari petition.

**Classification of Juvenile Offenders**

**{17}** The State argues that the Court of Appeals should not have overruled *Gonzales* because *Apprendi* does not apply to amenability proceedings for youthful offenders. Before we begin our analysis, we briefly describe New Mexico's three-tiered juvenile offender classification.

**{18}** The Delinquency Act establishes three levels of juvenile offenders, largely based on the alleged offense leading to the filing of a petition against the child. At the upper extreme are serious youthful offenders, children between the ages of fifteen and eighteen who are charged with first-degree murder. *See* NMSA 1978, § 32A-2-3(H) (1993) (amended 2009). Serious youthful offenders are automatically tried and, if convicted, sentenced as adults. *Id.* (citing *State v. Muniz*, 2003-NMSC-021, ¶ 21, 134 N.M. 152, 74 P.3d 86). At the other end of the spectrum are delinquent offenders, children of any age up to eighteen who have committed other less serious acts "that would be designated as a crime under the law if committed by an adult." Section 32A-2-3(A). Delinquent offenders are tried in the children's court and, if adjudicated, can receive a maximum disposition of commitment to a juvenile facility until their twenty-first birthday. *See* NMSA 1978, § 32A-2-19(B)(1)(c) (1993) (amended 2009).

**{19}** The intermediate classification of juvenile offender, the youthful offender, has required our repeated attention and is the one relevant to this case. *See, e.g.*, *State v. Jones*, 2010-NMSC-012, 148 N.M. 1, 229 P.3d 474. Youthful offenders are children between the ages of fourteen and eighteen who (1) are adjudicated for any of a list of felonies, enumerated by statute, which have consequences less serious than first-degree murder, including the offenses to which Child pleaded guilty in this case, or (2) have three prior, separate felony adjudications within the three years preceding the offense. *See* § 32A-2-3(J). Youthful offenders also include fourteen-year-old children adjudicated for first-degree murder. *See id.* When a child is an alleged youthful offender, the State may seek an adult sentence by giving notice of its intent to do so within ten days of filing the initial petition. *See* § 32A-2-20(A). The child is then tried in children's court, but according to the Rules of Criminal Procedure for the District Courts. *See* Rule 10-101(A)(2)(b) NMRA. If the child is adjudicated for the alleged offense, the children's court must hold an amenability hearing pursuant to Section 32A-2-20(B)(1), to determine whether it has the discretion to sentence the child as an adult.

**The *Apprendi* Line of Cases Through *Cunningham***

6

**{20}** Turning to the matter at hand, we begin with an overview of the history of the *Apprendi* rule. In *Apprendi*, the Supreme Court invalidated New Jersey's "hate crime" law, which the trial judge relied on to extend the defendant's sentence after finding by a preponderance of the evidence that the defendant's various weapons-related offenses had been "motivated by racial bias." *Apprendi*, 530 U.S. at 470-71 (internal quotation marks and citation omitted). In striking down the "hate crime" law, the Supreme Court articulated a bright-line rule, predicated on the Sixth Amendment right to a trial by jury as applied to the states through the Fourteenth Amendment. *Id.* at 525. "Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Id.* at 490. As Justice O'Connor predicted in her dissent, the so-called *Apprendi* rule has had a pivotal impact on criminal sentencing procedures across the nation. *See id.* at 524 (O'Connor, J., dissenting) (characterizing the majority's ruling as a "watershed change in constitutional law").

**{21}** The trend coming out of the Supreme Court's post-*Apprendi* decisions was unmistakable. *See Cunningham v. California*, 549 U.S. 270 (2007) (invalidating California's guidelines); *United States v. Booker*, 543 U.S. 220 (2005) (invalidating the federal sentencing guidelines); *Blakely v. Washington*, 542 U.S. 296 (2004) (invalidating Washington's sentencing scheme); *Ring v. Arizona*, 536 U.S. 584 (2002) (invalidating Arizona's death penalty sentencing scheme); *Apprendi*, 530 U.S. 466 (invalidating New Jersey's sentencing scheme); *see also United States v. O'Brien*, __ U.S. __, __, 130 S. Ct. 2169, 2182 (2010) (holding that the judge's finding—that the weapon used in a drug trafficking crime was a machine gun—violated *Apprendi* because it increased the defendant's mandatory sentence from five to thirty years). The result in each of these cases was the same. The Court applied the bright-line *Apprendi* rule and declared each sentencing scheme unconstitutional because a judge, not a jury, made a factual determination that increased a criminal penalty beyond the statutory maximum that otherwise would have applied without that determination. *But see Booker*, 543 U.S. at 249-50 (remedying the constitutional defect of the federal sentencing guidelines by excising the provision requiring their mandatory application).

**{22}** The Court did not flinch or deviate from the binary, black-or-white *Apprendi* analysis. If anything, the Court strengthened the *Apprendi* rule when, in response to the State of Washington's defense of its sentencing scheme,[2] it clarified that the "statutory maximum" beyond which a judge, as opposed to a jury, may not increase a sentence is "the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant*." *Blakely*, 542 U.S. at 303. The Court intended its rule

---

[2]The sentencing statute in *Blakely* set the "standard range" for second-degree kidnaping at 49-53 months but allowed a trial judge to sentence a defendant up to ten years based on a finding of "substantial and compelling reasons justifying an exceptional sentence." *Blakely*, 542 U.S. at 299, 325-26 (internal quotation marks and citation omitted).

to apply literally, regardless of what some warned as "the collateral, widespread harm to the criminal justice system and the corrections process, . . . resulting from the Court's wooden, unyielding insistence on expanding the *Apprendi* doctrine far beyond its necessary boundaries." *Cunningham*, 549 U.S. at 295 (Kennedy, J., dissenting).

**{23}** More than once this Court has wrestled with the *Apprendi* rule, most recently in *State v. Frawley*, 2007-NMSC-057, 143 N.M. 7, 172 P.3d 144, where we were compelled to apply the Supreme Court's approach to criminal sentencing to our own statutory framework. In *Frawley*, 2007-NMSC-057, ¶ 22, we overruled an opinion that we had issued less than two years earlier, *State v. Lopez*, 2005-NMSC-036, 138 N.M. 521, 123 P.3d 754, and held unconstitutional a provision of the Criminal Sentencing Act which allowed a trial judge to increase a defendant's basic sentence by up to one-third upon a finding of certain aggravating circumstances. *See* NMSA 1978, § 31-18-15.1 (1979) (amended 2009). The result in *Frawley* was, as a practical matter, dictated by the Supreme Court's decision in *Cunningham*, 549 U.S. 274, which held that a similar sentencing scheme ran afoul of the *Apprendi* rule. *Frawley*, 2007-NMSC-057, ¶ 22 ("We have no choice but to conclude that Frawley's sentence was altered upwards in contravention of the Sixth Amendment . . . ."). Our opinion in *Frawley* remains good law today, and nothing said in this Opinion should be taken as undermining either its holding or rationale.

**{24}** If the Supreme Court had stopped at *Cunningham*, we would be hard-pressed to disagree with our Court of Appeals that judge-made amenability determinations under Section 32A-2-20 violate the *Apprendi* rule. If we were to assume—as did the Court of Appeals—that the amenability determination falls within the scope of the *Apprendi* rule, then the Court of Appeals' conclusion would appear correct. After all, Section 32A-2-20(B) and (C) does permit a trial judge to increase a youthful offender's sentence far beyond the juvenile disposition that would otherwise apply, based on findings not made by a jury or admitted by the child relating to non-amenability to treatment or rehabilitation as a juvenile. *See Blakely*, 542 U.S. at 303 (defining "statutory maximum" as the maximum sentence that "a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant*"). According to *Blakely*, that "should be the end of the matter." *Id.* at 313. As we explain below, however, we reach a contrary result because we take a different view of the Supreme Court's most recent opinion in *Ice*. Based on *Ice,* we conclude that the *Apprendi* rule, and the Sixth Amendment on which it stands, was never designed to reach collateral decisions like amenability to treatment or rehabilitation that are not tied to the offenses charges.

### *Oregon v. Ice* **Defines the Outer Limit of the** *Apprendi* **Rule**

**{25}** In 2009, the Supreme Court finally marked the outer limit of the *Apprendi* rule in *Ice*, __ U.S. __, 129 S. Ct. 711, and in so doing reframed our analysis. In *Ice*, a jury found the defendant guilty of two counts of first-degree burglary and four counts of first-degree sexual assault, stemming from two occasions in which he broke into an apartment and sexually assaulted an eleven-year-old girl. __ U.S. at __, 129 S. Ct. at 715. Oregon's sentencing

statute generally requires a trial judge to impose concurrent sentences, limiting the defendant's prison exposure in *Ice* to a maximum of 90 months. But at sentencing the trial judge found that the two burglaries and two sets of sexual assault "constituted 'separate incident[s],'" triggering the judge's statutory discretion to impose consecutive sentences. *Id.* at ___, 129 S. Ct. at 715-16 (citation omitted). Exercising that discretion, the judge imposed a 340-month sentence from which the defendant appealed. He argued that the sentencing statute violated the *Apprendi* rule because it permitted a trial judge to increase a sentence based on the finding of a fact not submitted to a jury and not proven beyond a reasonable doubt. *Id.* at ___, 129 S. Ct. at 716. The Oregon Supreme Court agreed with the defendant that the concurrent sentencing statute violated *Apprendi*. *Ice*, ___ U.S. at ___, 129 S. Ct. at 716.

**{26}**    The U.S. Supreme Court reversed, holding that the *Apprendi* rule simply does not apply. The majority held that the concurrent sentencing statute is beyond "the *scope* of the Sixth Amendment's jury-trial guarantee, as construed in *Apprendi*." *Ice*, ___ U.S. at ___, 129 S. Ct. at 714 (emphasis added). In other words, whether Oregon's statute leads to an increase in sentence without a jury finding—the *Apprendi* rule—is irrelevant; the statute does not implicate the constitutional concerns which the rule was meant to address. *See Ice*, ___ U.S. at ___, 129 S. Ct. at 718.

**{27}**    The Court made clear that it viewed the sentencing statute in *Ice* as fundamentally different from those that it had considered in the previous cases applying the *Apprendi* rule. According to the 5-4 majority, the *Apprendi* rule had only been applied to sentencing in the "offense-specific context," *Ice*, ___ U.S. at ___, 129 S. Ct. at 714, whereas the defendant in *Ice* was seeking to expand the rule beyond the facts of his offense to consecutive-sentencing findings for "multiple offenses different in character or committed at different times." *Id.* at ___, 129 S. Ct. at 717. Because of this difference, the central question for the Court was whether to "extend" the *Apprendi* rule to a new area of criminal sentencing law—concurrent or consecutive sentencing—in which the jury traditionally had played no role. *See Ice*, ___ U.S. at ___, 129 S. Ct. at 717.

**{28}**    To determine whether to extend *Apprendi* to the realm of consecutive sentencing, the Court looked to the "twin considerations" of "historical practice and respect for state sovereignty." *Ice*, ___ U.S. at ___, 129 S. Ct. at 717. The Court's historical inquiry focused on "whether the finding of a particular fact was understood as within 'the domain of the jury . . . by those who framed the Bill of Rights.'" *Id.* (quoting *Harris v. United States*, 536 U.S. 545, 557 (2002) (plurality opinion)). The Court noted that, historically, the judge had controlled the decision to impose sentences consecutively or concurrently; traditionally the jury had played no role. *Id.* Further, the "prevailing practice" historically had been to impose consecutive sentences; concurrent sentences were the exception. Therefore, Oregon's statutory presumption in favor of concurrent sentences, subject to a finding by the judge, did not impinge upon the traditional role of the jury.

There is no encroachment here by the judge upon facts historically found by

9

the jury, nor any threat to the jury's domain as a bulwark at trial between the State and the accused. Instead, the defendant—who historically may have faced consecutive sentences by default—has been granted by some modern legislatures statutory protections meant to temper the harshness of the historical practice.

*Id.* at ___, 129 S. Ct. at 718. For the same reasons, the Court held that the statute did not create an "entitlement" to have the concurrent sentencing findings made by a jury. Rather, "the scope of the constitutional jury right must be informed by the historical role of the jury at common law"—leaving legislatures free to make policy choices unfettered by the *Apprendi* rule insofar as they pertain to areas outside the historical role of the jury. *Ice*, _ U.S. at __, 129 S. Ct. at 718.

**{29}** Also counseling against extending the *Apprendi* rule to consecutive-sentencing determinations are principles of federalism, or state sovereignty, which include "the authority of States over the administration of their criminal justice systems." *Ice*, ___ U.S. at _, 129 S. Ct. at 718. The Court expressed concern over "straitjacketing" the States from pursuing the "'salutary objectives' of promoting sentences proportionate to 'the gravity of the offense.'" *Id.* at __, 129 S. Ct. at 719 (quoting *Blakely*, 542 U.S. at 308). Similarly, the Court made a slippery-slope argument that the application of *Apprendi* to consecutive sentencing could extend to other sentencing determinations that judges make, other than the length of incarceration, such as findings relating to the length of supervised release following a prison sentence, terms of community service, and imposing fines or restitution. *Ice*, _ U.S. at __, 129 S. Ct. at 719. "Intruding *Apprendi*'s rule into these decisions on sentencing choices or accoutrements surely would cut the rule loose from its moorings." *Ice*, __ U.S. at ___, 129 S. Ct. at 719. Finally, the Court voiced reluctance to burden states with the added administrative difficulties that adhere to the criminal process when juries are involved beyond *Apprendi*'s core concern of safeguarding the traditional role of the jury. *Ice*, _ U.S. at __, 129 S. Ct. at 719.

**{30}** Perhaps most revealing of new limits for the *Apprendi* rule, Justice Scalia's dissent voiced frustration that the majority opinion "is a virtual copy of the dissents" in each of the prior cases applying the *Apprendi* rule. *Ice*, __ U.S. at __, 129 S. Ct. at 720 (Scalia, J., dissenting). His dissent repeatedly emphasizes that the historical and sovereignty-based arguments relied on by the majority are "the same (the *very* same) arguments" rejected in *Apprendi*. *Ice*, ___ U.S. at ___, 129 S. Ct. at 721. Justice Scalia is not wrong in his assessment.

**{31}** *Ice* signals change. The *Ice* majority opinion appears to embrace, for the first time, the point of view taken in the dissenting opinions in the *Apprendi* line of cases. The opinion does appear to represent a pivotal turning point in the Court's Sixth Amendment analysis, signaling a demarcation of how far at least a majority of the Court will extend *Apprendi*'s black-or-white rule. After all, the trial judge in *Ice* did enlarge the defendant's sentence well beyond the statutory maximum based upon a factual determination made by the judge and

not the jury. And yet, the Court looked beyond just the obvious, arithmetic impact on sentencing to explore the historical roots—and the limits—of the *Apprendi* rule.

**{32}** Though we have struggled before in our efforts to divine how the Supreme Court would apply its rule, *see Lopez*, 2005-NMSC-036, we take *Ice* at face value and the majority at its word. The majority made clear that it will not "'expand[] the *Apprendi* doctrine far beyond its necessary boundaries.'" *Ice*, ___ U.S. at ___, 129 S. Ct. at 719 (quoting *Cunningham*, 549 U.S. at 295 (Kennedy, J., dissenting)). Our principal difference with the Court of Appeals distills to this one Supreme Court opinion. We think the Court of Appeals placed too little emphasis on *Ice* in reaching its conclusion.

**{33}** After *Ice*, the *Apprendi* rule continues to apply with full force to judicial findings enlarging criminal sentences that conflict with the traditional domain of the jury. Where a defendant seeks to "extend" the *Apprendi* rule, however, beyond the context of the sentencing statutes in the *Apprendi* line of cases, this Court will engage in a more probing analysis taking into account the historical role of the jury and the effect on principles of federalism.

**The findings required by Section 32A-2-20(B) are beyond the scope of the *Apprendi* rule.**

**{34}** We now turn to the substantive issue before us, which is whether the findings required by Section 32A-2-20(B) are unconstitutional because they deprive youthful offenders of a Sixth Amendment right to have a jury make those findings, as that right is defined in *Apprendi* and limited by *Ice*. We begin, as the Supreme Court did in *Ice,* and as our Court of Appeals did in *Gonzales*, with our view that Child's proposal to apply *Apprendi* to Section 32A-2-20(B) would extend the *Apprendi* rule beyond the context in which it arose and previously has been applied. We agree with the State that the findings required by Section 32A-2-20(B), like the findings in *Ice*, are not offense-specific. At its core, Section 32A-2-20(B) mandates a careful balancing of individual and societal interests involving a delinquent child's prospects for reintegration into public life by the time the child turns twenty-one. Importantly, the focus of the findings at issue is on the *child*, not on the particular offense committed. *See* § 32A-2-20(B) (providing that to sentence a youthful offender as an adult, the judge must find that "(1) the *child* is not amenable to treatment or rehabilitation as a child in available facilities; and (2) the *child* is not eligible for commitment to an institution for children with developmental disabilities or mental disorders" (emphasis added)).

**{35}** Admittedly, the particular circumstances of the child's offense may have some bearing on this decision. For example, some of the *factors* that the judge must weigh under Section 32A-2-20(C) are "offense specific," such as

> (2) whether the alleged offense was committed in an aggressive, violent, premeditated or willful manner;

11

(3) whether a firearm was used to commit the alleged offense; [and]
(4) whether the alleged offense was against persons or against property, greater weight being given to offenses against persons, especially if personal injury resulted.

However, the judge must also consider a range of other information relating to the child that has little or nothing to do with the charged offenses. *See* § 32A-2-20(C)(5), (7) (providing that the trial judge shall consider "the maturity of the child as determined by consideration of the child's home, environmental situation, social and emotional health, pattern of living, brain development, trauma history and disability" and "the prospects for adequate protection of the public and the likelihood of reasonable rehabilitation of the child by the use of procedures, services and facilities currently available").

**{36}**    Regardless of the particular offense of which a youthful offender is adjudicated—or, as this case demonstrates, even the number of offenses—the inquiry under Section 32A-2-20(B) is the same:  Can the child be rehabilitated or treated sufficiently to protect society's interests by the time he reaches the age of twenty-one?  Questions of rehabilitation and societal protection are exactly what dominated the thinking of the trial judge in this very case.  The inquiry is neither offense-specific nor, as we shall see, is it a task traditionally performed by juries.  Nonetheless, though we hold that the context and purpose of the findings required under Section 32A-2-20(B) insulate them from the *Apprendi* rule, we think it prudent to submit the offense-specific factors in Section 32A-2-20(C)(2), (3) and (4) to the jury during the trial perhaps by way of special interrogatories.  Doing so will place only a minimal burden on the process because it can be done during the trial.  We refer this matter to the UJI Committee for Criminal Cases for appropriate action.

**Factors Leading to an *Ice* Analysis**

**{37}**    We are also persuaded, as was the U.S. Court of Appeals for the Tenth Circuit in *Gonzales v. Tafoya*, 515 F.3d 1097(10th Cir. 2008), that the predictive nature of the findings required by Section 32A-2-20 set them apart from the findings considered in the *Apprendi* cases. *See Gonzales*, 515 F.3d at 1114 (holding on habeas review that the findings required by Section 32A-2-20 do not violate the *Apprendi* rule).  As Tenth Circuit Chief Judge Henry noted in *Gonzales*, the Supreme Court has generally applied the *Apprendi* rule to retrospective findings, because such findings are more susceptible to a decision by the jury beyond a reasonable doubt. *Gonzales*, 515 F.3d at 1113.  By contrast, the not-amenable-to-treatment and not-eligible-for-commitment findings at issue here are forward-looking determinations, which necessarily involve a level of uncertainty and informed judgment—as opposed to historical fact-finding—that is not typically submitted to a jury. *Cf. Addington v. Texas*, 441 U.S. 418, 429 (1979) ("Given the lack of certainty and the fallibility of psychiatric diagnosis, there is a serious question as to whether a state could ever prove beyond a reasonable doubt that an individual is both mentally ill and likely to be dangerous.").

**{38}** As our courts have seen first-hand, an informed amenability determination can be made only by weighing a thorough knowledge of the resources for treatment and rehabilitation offered by the State against various, and often conflicting, psychological and social evaluations of "the child's home, environmental situation, social and emotional health, pattern of living, brain development, trauma history and disability." Section 32A-2-20(C)(5). Like the civil commitment findings in *Addington*, the fallibility and lack of precision inherent in the amenability determination "render certainties virtually beyond reach in most situations." 441 U.S. at 430. Indeed, both our Court of Appeals and the Tenth Circuit relied on this distinction when they rejected *Apprendi*-based challenges to Section 32A-2-20. *See Gonzales*, 2001-NMCA-025, ¶¶ 47-48; *Gonzales*, 515 F.3d at 1114. Although the historical/predictive distinction was not relevant in *Ice*, we find it meaningful here.

**{39}** Additionally, the findings in the *Apprendi* line of cases uniformly occurred in the *adult* criminal context, whereas, the findings required by Section 32A-2-20(B) arise in the juvenile justice context. *See Gonzales*, 515 F.3d at 1111 (noting that "*Apprendi* did not involve judicial findings that a juvenile should be prosecuted as an adult"). The Supreme Court has traditionally given states wider latitude in adopting particular trial and sentencing procedures for juveniles—including whether to have a jury trial at all. *See McKeiver v. Pennsylvania*, 403 U.S. 528, 550 (1971) (holding that the right to a jury trial does not apply to juvenile proceedings). Given that *Ice* expressly instructs us to consider principles of federalism and state sovereignty in determining whether to apply *Apprendi*, we find this distinction particularly significant.

**{40}** We are persuaded that applying the *Apprendi* rule here—to findings that are not offense-specific, are predictive in nature, and are made in the juvenile context—represents an extension of the circumstances under which the rule has previously been applied. We will therefore look to the "twin considerations" of "historical practice and respect for state sovereignty" to determine whether the Sixth Amendment jury-trial guarantee extends to the findings required by Section 32A-2-20. *Ice*, __ U.S. at __, 129 S. Ct. at 717.

**The Jury Historically Played No Role in Sentencing a Child as an Adult**

**{41}** As an initial matter, Child and *Amici* both argue that, although the Sixth Amendment right to a jury trial does not apply to juvenile proceedings under *McKeiver*, New Mexico, nonetheless, confers such a right as a matter of law "when the offense alleged would be triable by jury if committed by an adult." NMSA 1978, § 32A-2-16(A) (2009). *Apprendi*'s Sixth Amendment protections, the argument goes, extend to alleged youthful offenders who are, by definition, charged with an offense that would be triable by a jury if committed by an adult. *See* § 32A-2-3(J) (defining "youthful offender" and listing youthful offender offenses). For the sake of argument, we can concede the point. *See Rudy B.*, 2009-NMCA-104, ¶ 65 (Sutin, J., specially concurring) (noting that youthful offenders are treated as adults who are protected under the Sixth Amendment). However, that is only the beginning of our inquiry. To determine whether *Apprendi* applies, *Ice* teaches that we must look to "whether the finding of a particular fact was understood as within 'the domain of the jury . . . by those

13

who framed the Bill of Rights.'" __ U.S. at __, 129 S. Ct. at 717 (quoting *Harris*, 536 U.S. at 557).

**{42}** We agree with the Court of Appeals that the historical analysis undertaken in *Ice* would be a poor fit here if the inquiry were limited to whether the post-trial amenability determination required by Section 32A-2-20(B) was within the purview of the jury at the time of the framing of the Bill of Rights. *See Rudy B.*, 2009-NMCA-104, ¶ 23. As we shall discuss, our post-trial amenability proceeding for youthful offenders (as opposed to a pre-trial waiver determination) is unique among the several states and did not exist until 1993 when the Legislature enacted its most recent version of our Children's Code. *See id.*; *see also Jones*, 2010-NMSC-012, ¶ 31 (citing Daniel M. Vannella, Note, *Let the Jury Do the Waive: How Apprendi v. New Jersey Applies to Juvenile Transfer Proceedings*, 48 Wm. & Mary L. Rev. 723, 753 (2006)). However, *Ice*'s focus is on the historical origins of the findings themselves and not on whether those findings occur before or after trial. Therefore, our historical analysis is not limited to the precise setting in which our children's court judges currently make the amenability determination.

**{43}** Although the timing of our amenability proceeding is unique, the specific inquiry of whether a child is amenable to treatment or rehabilitation is hardly exclusive to New Mexico. Since Cook County, Illinois established the first juvenile court in 1899, all 50 states have enacted some form of juvenile code that emphasizes treatment and rehabilitation, as opposed to punishment, for juvenile offenders. However, the juvenile codes also allow for adult treatment when the child is determined to be incapable of reform. *See* Samuel M. Davis, *Rights of Juveniles 2d: The Juvenile Justice System* § 1:1, at 1-2 (2d ed. 2010). Unlike New Mexico's current, post-adjudicatory proceeding, the overwhelming majority of states considers the amenability question at the initiation of proceedings against the child at a transfer or "waiver" hearing. *See* Davis, *supra* § 4:1, at 212 (explaining that New Mexico is currently one of only five states that do not "provide by statute for waiver of jurisdiction or a functional equivalent").

**{44}** The focus of the pre-trial waiver proceeding followed in other states is similar to our post-trial amenability hearing. The judge must determine whether to waive the jurisdiction of the juvenile court in favor of the adult trial court based on the child's amenability to treatment or rehabilitation. Prior to 1993, New Mexico made the amenability determination in a pre-trial waiver proceeding. *See* 1955 N.M. Laws, ch. 205, § 9 (requiring the trial judge to make a finding that the child was not a "proper subject for reformation or rehabilitation" prior to initiating adult proceedings); NMSA 1953, § 13-14-27(A)(2) (Vol. 3, Repl., Part 1); 1975 N.M. Laws, ch. 320, § 4(A)(5). Thus, while New Mexico now makes the amenability determination post-trial, the inquiry is largely the same as that of a pre-trial waiver proceeding: whether the child should be subjected to adult consequences based on the lack of prospects for successful treatment and rehabilitation.

**{45}** Of the courts to consider whether judge-made, pre-trial waiver determinations violate the right to a jury trial, "the overwhelming weight of authority . . . concludes that

14

*Apprendi* does not apply to juvenile waiver hearings." *State v. Kalmakoff*, 122 P.3d 224, 227 n.29 (Alaska Ct. App. 2005) (citing 15 decisions from other jurisdictions holding that the findings made in waiver proceedings do not violate *Apprendi*); *see also Gonzales*, 515 F.3d at 1116 (same); Vannella, *supra*, at 751 (noting that most of the courts considering whether *Apprendi* applies to waiver proceedings have held that it does not). *But see Commonwealth v. Quincy Q.*, 753 N.E.2d 781, 789 (Mass. 2001) (holding that *Apprendi* requires the prosecution to present sufficient evidence to the grand jury that the child's conduct "involved the infliction or threat of serious bodily harm" to indict a juvenile as a youthful offender), *overruled on other grounds by Commonwealth v. King*, 834 N.E.2d 1175, 1201 n.28 (2005). None of those cases, however, occurred recently enough to apply *Ice* and, therefore, we do not place great reliance upon them here.

**{46}** Interestingly, the factors that the New Mexico judge must consider under Section 32A-2-20(C) to determine whether to invoke an adult sentence are used in other jurisdictions to determine whether waiver is appropriate. 2 Wayne R. LaFave, *Substantive Criminal Law* § 9.6(d), at 69-70 (2d ed. 2003). These factors are largely identical to a set of criteria laid out by the U.S. Supreme Court in *Kent v. United States*, 383 U.S. 541, 566-67 (1966). The Court offered these factors as considerations that *the trial judge* should weigh in making the waiver decision to ensure procedural fairness and due process in juvenile waiver proceedings.[3] Significantly, of the 45 states that have pre-trial waiver hearings, all of them

---

[3]The criteria in *Kent,* 383 U.S. at 566-67, provides as follows:

　　1. The seriousness of the alleged offense to the community and whether the protection of the community requires waiver.

　　2. Whether the alleged offense was committed in an aggressive, violent, premeditated or willful manner.

　　3. Whether the alleged offense was against persons or against property, greater weight being given to offenses against persons especially if personal injury resulted.

　　4. The prosecutive merit of the complaint, i.e., whether there is evidence upon which a Grand Jury may be expected to return an indictment (to be determined by consultation with the United States Attorney).

　　5. The desirability of trial and disposition of the entire offense in one court when the juvenile's associates in the alleged offense are adults who will be charged with a crime in the U.S. District Court for the District of Columbia.

　　6. The sophistication and maturity of the juvenile as determined by consideration of his home, environmental situation, emotional attitude and pattern of living.

　　7. The record and previous history of the juvenile, including previous contacts with the Youth Aid Division, other law enforcement agencies, juvenile courts and other jurisdictions, prior periods of probation to this

15

allow the *judge* "to transfer juveniles to adult court after making specified findings." *Gonzales*, 515 F.3d at 1116 (citing Vannella, *supra*, at 739).

**{47}** Similarly, since the inception of the first New Mexico Juvenile Code in 1917, our statutes and caselaw make clear that it is the trial judge, not the jury, who decides whether to invoke an adult sentence based on a child's amenability to treatment—whether pre- or post-adjudication. Since 1955, the trial judge has been expressly required by statute to decide whether a child is amenable to treatment or rehabilitation based upon certain findings. *See* 1955 N.M. Laws, ch. 205, § 9 (requiring the trial judge to make a finding that the child was not a "proper subject for reformation or rehabilitation" prior to initiating adult proceedings); § 13-14-27(A)(2); 1975 N.M. Laws, ch. 320, § 4(A)(5); § 32A-2-20(B). Before 1955, the trial judge had the discretion to try and sentence a juvenile as an adult. As this Court explained in *State v. Doyal*, 59 N.M. 454, 286 P.2d 306 (1955), the judge made that decision by weighing the same interests presently required by Section 32A-2-20.

> [M]ay we not fairly assume that in whatever capacity as judge he acts [whether as a judge of the district court or the juvenile court], he will so exercise his discretion as to try no child in the district court for what would have been a felony if done by an adult, if extreme youth of the offender plus other facts in evidence gives reasonable promise of his rehabilitation by treatment in the juvenile court; nor at all save where the demands of society for the prevention and punishment of crime are so compelling as to leave no other alternative.
>
> . . . .
>
> . . . . Never, since our legislature enacted the first Juvenile Delinquency Act, has it attempted to deny district courts their traditional and constitutional power to place on trial one accused of having committed a felony, merely because his age at the time of the offense placed him below the maximum named in the statute for juvenile delinquents.

*Doyal*, 59 N.M. at 461-62, 286 P.2d at 311-12.

**{48}** *Doyal* establishes that, since the inception of separate proceedings for juveniles in 1917, the trial judge—not the jury—was responsible for determining whether to try and sentence a child as an adult based on the child's amenability to treatment or rehabilitation.

---

Court, or prior commitments to juvenile institutions.

　　8. The prospects for adequate protection of the public and the likelihood of reasonable rehabilitation of the juvenile (if he is found to have committed the alleged offense) by the use of procedures, services and facilities currently available to the Juvenile Court.

Put simply, the trial judge has decided the child's amenability to treatment or rehabilitation for as long as that determination has been a part of criminal proceedings in New Mexico.

**{49}** Child argues in the present case that the rebuttable presumption for children between the ages of seven and fourteen, also known as the common-law infancy defense, provides the appropriate historical analog to the modern-day amenability determination. The infancy defense required the prosecution to prove that when a child subject to the rebuttable presumption committed the alleged offense, the child "manifested a consciousness of guilt, and a discretion to discern between good and evil." 4 William Blackstone, *Commentaries on the Laws of England* 23-24 (1769); *see* 2 LaFave, *supra* § 9.6(a), at 62-63. The State had to prove the child's criminal capacity to the jury beyond a reasonable doubt. *See Commonwealth v. Mead*, 92 Mass. 398, 399 (1865) ("[T]he question whether, in committing an offence, such child in fact acted with intelligence and capacity, and an understanding of the unlawful character of the act charged, is to be determined by the jury upon the evidence, and in view of all the circumstances attending the alleged criminal transaction."). Child argues that the finding of infancy and the finding of amenability are essentially the same and, therefore, because the jury historically decided whether the infancy defense was applicable, *Apprendi* should apply.

**{50}** We are not persuaded. The infancy defense, which acted as a complete bar to criminal liability, was a rebuttable presumption that a child of a certain age could not form the necessary criminal intent to commit the crime of which he was accused. In other words, a child who raised the infancy defense effectively argued that, although he committed the *act* necessary to constitute the charged offense, he should be relieved from liability because he did not understand the moral consequences of his actions—he was not culpable. Infancy is, thus, a determination of historical fact closely linked to *mens rea*, one of the essential elements of most crimes and historically determined by the jury.

**{51}** By contrast, the amenability finding does not exonerate the child or render him blameless. As with any criminal proceeding, the jury may find at the adjudicatory stage that a juvenile lacked the requisite *mens rea* to be guilty of the charged offense. *See Addington*, 441 U.S. at 428 (recognizing that *In re Winship,* 397 U.S. 358, 367 (1970), the U.S. Supreme Court held that the state must prove "[the juvenile's act and *intent*] beyond a reasonable doubt" (emphasis added)). Rather, the amenability determination is predictive and focuses on the child's *prospective* capacity for treatment or rehabilitation. This difference persuades us that the jury's traditional determination of infancy is not helpful to our resolution.

**{52}** Even more to the point, the amenability determination only applies to youthful offenders, who by definition must be at least fourteen years of age, *see* § 32A-2-3(J); whereas, the common-law infancy defense only applied to children between the ages of seven and fourteen. The jury, therefore, played no historical role in determining whether a child over the age of fourteen had the capacity to commit a crime, because at common law such children "had the same capacity as adults" and were commonly treated as such. 2 LaFave, *supra* § 9.6(a), at 62-63. Clearly, we can conclude that the amenability

17

determination is not an "encroachment . . . by the judge upon facts historically found by the jury, nor any threat to the jury's domain as a bulwark at trial between the State and the accused." *Ice*, __ U.S. at __, 129 S. Ct. at 718. Rather, like the concurrent sentencing statute in *Ice*, the amenability inquiry is a statutory protection granted to juveniles by our Legislature "to temper the harshness of the historical practice," *id.*, which often led to older children being incarcerated next to hardened criminals. *See In re Gault*, 387 U.S. 1, 15 (1967) ("The early reformers were appalled by adult procedures and penalties, and by the fact that children could be given long prison sentences and mixed in jails with hardened criminals.").

**{53}** Neither Child nor the State offer any other historical basis for us to determine whether *Apprendi*'s rule is applicable to the amenability determination, and we can find none. Thus, although the amenability determination was not an aspect of the prosecution of juveniles at the time of the framing of the Bill of Rights, it has been a question for the judge—not the jury—since the creation of the juvenile court systems at the turn of the twentieth century. Put simply, an amenability determination has never been based upon facts "historically found by the jury," and so it cannot be a "threat to the jury's domain" as preserved in the U.S. Constitution. We now turn to the second of *Ice*'s "twin considerations," state sovereignty and principles of federalism.

**Principles of federalism preclude the application of *Apprendi* to the amenability finding.**

**{54}** As *Ice* explained, "[w]e have long recognized the role of the States as laboratories for devising solutions to difficult legal problems." __ U.S. at __, 129 S. Ct. at 718-19 (citing *New State Ice Co. v. Liebmann*, 285 U.S. 262, 311 (1932) (Brandeis, J., dissenting)). *Ice* further acknowledged the states' traditional sovereign authority over "the administration of their criminal justice system." __ U.S. at __, 129 S. Ct. at 718. The realm of juvenile procedures and sentencing is particularly within the states' area of exclusive control. When considering whether the Sixth Amendment's right to a jury trial extends to juvenile proceedings, the Supreme Court held, "We are reluctant to disallow the States to experiment further and to seek in new and different ways the elusive answers to the problems of the young . . . ." *McKeiver*, 403 U.S. at 547.

**{55}** To be sure, the Supreme Court has made clear that juvenile proceedings must meet minimal constitutional requirements. *Kent* set the minimum procedural requirements for waiver proceedings, 383 U.S. at 566-67; *In re Gault* extended to juveniles the right to notice of charges, to counsel, to confrontation and to cross-examination of witnesses, and to the privilege against self-incrimination, 387 U.S. at 33-34, 41, 55-56; *In re Winship* gave juveniles the protection of the reasonable doubt standard, 397 U.S. at 367.

**{56}** At the same time, the Court has repeatedly emphasized that it follows a more deferential approach to state decisions of how to administer their juvenile court systems. "From the inception of the juvenile court system, wide differences have been

18

tolerated—indeed insisted upon—between the procedural rights accorded to adults and those of juveniles." *In re Gault*, 387 U.S. at 14. The amenability determination, being an essential step in the adjudication and disposition of children, is but one example of the independence traditionally afforded to states in this area. As such, our amenability determination is entitled to a level of deference based on traditional principles of federalism and state sovereignty. *See Ice*, __ U.S. at __, 129 S. Ct. at 719 ("This Court should not diminish that role [of states as laboratories] absent impelling reason to do so.").

**{57}** Given the states' discretion "to experiment further and to seek in new and different ways the elusive answers to the problems of the young," *McKeiver*, 403 U.S. at 547, it would strike us as inconsistent if *Apprendi* or the Sixth Amendment were to mandate a jury finding beyond a reasonable doubt that a child is not amenable to treatment or eligible for commitment. We have little doubt that states have the authority, however ill-advised it may be, to do away with the amenability determination altogether and to prosecute and sentence juveniles as adults. For example, New Mexico is one of 29 states that has enacted "legislative waiver" statutes which *automatically* subject juveniles charged with certain defined crimes to adult proceedings and sentences without the exercise of any judicial discretion. *See* Vannella, *supra*, at 741 (providing that a juvenile between the ages of 15 or 18 who is "charged with and indicted or bound over for trial for first-degree murder"—a so-called "serious youthful offender"—is not entitled to the protections of the Delinquency Act, citing Section 32A-2-3(H)). If our Legislature can deny the right to juvenile procedures and dispositions wholesale without offending the Constitution, then the Legislature ought to be able to extend greater protection to children—and establish a procedure for doing so—without running afoul of the Constitution. *See Ice*, __ U.S. at __, 129 S. Ct. at 719 ("To hem in States by holding that they may not equally choose to make concurrent sentences the rule, and consecutive sentences the exception, would make scant sense."). This is especially true when the jury has never played a role in making this determination.

**{58}** Finally, the same administrative burdens noted by the Supreme Court in *Ice* counsel against applying *Apprendi* to amenability determinations. *See Ice*, __ U.S. at __, 129 S. Ct. at 719. If *Apprendi* were to apply to a finding that has never been made by the jury, it seems difficult to limit its reach with respect to the other sentencing determinations that New Mexico allows its judges to make other than the length of incarceration. Applying *Apprendi* to a post-trial amenability determination would require bifurcated proceedings with attendant delay and added cost—a burden we are reluctant to impose absent a clear directive from the Constitution.

**{59}** In sum, because the amenability determination historically has not been made by the jury, applying *Apprendi* would interfere unnecessarily with New Mexico's traditional discretion in administering a system of juvenile justice. We hold that the amenability determination is not within the scope of the *Apprendi* rule and the Sixth Amendment's guarantee of a jury trial does not apply to amenability proceedings.

**CONCLUSION**

**{60}** We reverse the Court of Appeals' determination that Section 32A-2-20 is facially unconstitutional and remand to the Court of Appeals for consideration of Child's remaining appellate arguments that (1) there was insufficient evidence to support the findings necessary to sentence him as an adult, and (2) his separate convictions for shooting from a motor vehicle resulting in great bodily harm and aggravated battery with a deadly weapon violate constitutional protections against double jeopardy.

**{61}** **IT IS SO ORDERED**.

<br>

_____

**RICHARD C. BOSSON, Justice**

**WE CONCUR:**

_____

**CHARLES W. DANIELS, Chief Justice**

_____

**PATRICIO M. SERNA, Justice**

_____

**PETRA JIMENEZ MAES, Justice**

**EDWARD L. CHÁVEZ, Justice (dissenting)**

**CHÁVEZ, Justice, dissenting.**

**{62}** The Framers of the Bill of Rights would be alarmed to learn that a child can be condemned to an adult prison for up to a life sentence without at least the same constitutional protections afforded adults. In New Mexico a child who is "subject to the provisions of the Delinquency Act is entitled to the same basic rights as an adult." NMSA 1978, § 32A-2-14(A) (1993) (amended 2009). These rights include a jury trial if the offenses alleged would be triable by jury if committed by an adult. *State v. Eric M*., 1996-NMSC-056, ¶¶ 5-7, 122 N.M. 436, 925 P.2d 1198; Rule 10-245(A) NMRA. It is unconstitutional to increase an adult's sentence based on additional findings relating to the offense or the offender unless a jury finds such facts beyond a reasonable doubt. *State v. Frawley*, 2007-NMSC-057, ¶ 23, 143 N.M. 7, 172 P.3d 144. The majority concludes that it is constitutional to increase a child's sentence by decades and imprison the child in an adult prison, based on additional findings relating to the offense and the child, even though a judge and not a jury makes those findings and even though the judge finds such facts by something less than a reasonable doubt. Because I believe the time has come for us to unequivocally hold that a youthful offender is entitled to the same constitutional protections as an adult, I respectfully dissent.

**{63}** In this case, the child was condemned to an adult prison for twenty-five years based

20

on a judge's finding, not beyond a reasonable doubt but by clear and convincing evidence, that the child was not amenable to treatment in an available treatment facility. Without this finding, the judge could only commit the child to the Children, Youth & Families Department until he reached age twenty-one, NMSA 1978, § 32A-2-19(B)(1)(d) (1993) (amended 2009); *see also* NMSA 1978, § 32A-2-20(B) (1993) (amended 2009), which for this child would have been three and one-half years. Thus, the severe consequence to the child was being confined in an adult prison approximately twenty-two years longer than what his factual concessions alone authorized.

**{64}** In America an adult cannot be imprisoned unless a jury finds, beyond a reasonable doubt, all of the facts that support imposition of the penalty. *Duncan v. Louisiana*, 391 U.S. 145, 154 (1968). If the legislative branch defines a maximum sentence for a discrete crime, but also authorizes a judge to increase the maximum sentence for that discrete crime based on additional findings, the defendant has a Fifth and Sixth Amendment right to have a jury find the additional facts beyond a reasonable doubt. *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000). This is because at the time the Bill of Rights was framed, the jury traditionally found all facts that the law made essential for the punishment. *Blakely v. Washington*, 542 U.S. 296, 309 (2004).

**{65}** The United States Supreme Court has clearly defined the statutory maximum sentence for purposes of its analysis.

> [T]he relevant "statutory maximum" is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose *without* any additional findings. When a judge inflicts punishment that the jury's verdict alone does not allow, the jury has not found all the facts "which the law makes essential to the punishment," and the judge exceeds his proper authority.

*Id*. at 303-04 (citation omitted). When the judge, and not a jury, finds additional facts "related to the offense or the offender-beyond the elements of the charged offense" as a prerequisite to exercising discretion to increase a sentence beyond the statutory maximum, such a scheme is unconstitutional. *Cunningham v. California*, 549 U.S. 270, 279 (2007). Of course, the defendant may knowingly and voluntarily waive the jury determination or may admit the essential facts for the additional findings.

**{66}** In New Mexico, the basic sentence for an adult convicted of a non-capital first degree felony is eighteen years in prison, plus a period of parole and/or imposition of a fine not to exceed $15,000. NMSA 1978, § 31-18-15(A)(3), (C), & (E)(3) (1993) (amended 2007). Effective July 1, 2009, a judge may increase the sentence by up to one-third if a jury finds "beyond a reasonable doubt . . . any aggravating circumstances surrounding the offense or concerning the offender." NMSA 1978, § 31-18-15.1(A)(2) & (G) (1979) (amended 2009). Prior to its amendment in 2009, Section 31-18-15.1 authorized the judge to increase a defendant's basic sentence by up to one-third if the judge found aggravating circumstances

21

surrounding the offense or concerning the offender. We held that such a scheme was unconstitutional because the Sixth Amendment gave the defendant the right to have a jury make such findings beyond a reasonable doubt. *Frawley*, 2007-NMSC-057, ¶ 23. The simple and straightforward constitutional requirement is that "any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi*, 530 U.S. at 489. It is, however, perfectly constitutional for a judge to "exercise discretion-taking into consideration various factors relating both to offense and offender-in imposing a judgment *within the range* prescribed by statute." *Id*. at 481.

**{67}** The majority acknowledge the *Apprendi* bright-line rule, but then mistakenly depart from it, citing to *Oregon v. Ice*, ___ U.S. ___, 129 S. Ct. 711 (2009). Majority op. ¶¶ 20-24. In my opinion, it is a mistake to depart from the bright-line rule because *Ice* supports the opposite conclusion reached by the majority for at least three reasons. First, as for adults, the historical practice at common law was for a jury to find all facts that the law made essential for the punishment of a child between the ages of fourteen and eighteen. Second, if we are to honor our state sovereignty, we should not easily discard this State's insistence that a youthful offender has a constitutional right to a jury trial. The approach taken by the majority will mark the first time this Court has lessened the protections of a constitutional right on the altar of state sovereignty. Third, in this case the child was sentenced for a discrete offense not for "multiple offenses different in character or committed at different times." *Ice*, ___ U.S. at ___, 129 S. Ct. at 717.

## AT COMMON LAW, A JURY DECIDED ALL FACTS THAT AUTHORIZED IMPOSITION OF AN ADULT SENTENCE ON A CHILD

**{68}** The majority rely on the "twin considerations . . . historical practice and respect for state sovereignty" in declining to extend *Apprendi* to amenability evidentiary findings. Majority op. ¶ 39 (internal quotation marks and citation omitted). However, the majority has not accurately analyzed historical practice. The *Ice* majority cautiously explained that its historical inquiry is intended to honor common law practices by focusing on "whether the finding of a particular fact was understood as within 'the domain of the jury . . . by those who framed the Bill of Rights.'" ___ U.S. at ___, 129 S. Ct. at 717 (quoting *Harris v. United States*, 536 U.S. 545, 557 (2002) (plurality opinion)). The question is whether the jury function at issue extended down through the centuries into the common law. *Id*. In this case, the proper question is did the jury historically under common law find all facts essential for imposing an adult sentence on a child? The majority ignores over 125 years of historical common law practice whereby a jury traditionally decided the facts that authorized a child between the ages of fourteen and eighteen to be punished as an adult. Majority op. ¶ 48. Instead, the majority seeks to commence the historical practice in 1917 with the inception of separate juvenile proceedings. Majority op. ¶ 47.

**{69}** Separate juvenile proceedings did not exist at common law, so it was impossible for the Framers of the Bill of Rights to understand that a judge and not a jury would make

22

findings that authorized the imprisonment of a child in an adult prison. All the Framers could have known was that a fourteen- to eighteen-year-old child who was accused of a crime was (1) treated the same as an adult, and (2) enjoyed the same constitutional protections as an adult. The *Ice* Court's focus was on consecutive sentencing of a defendant for multiple convictions. The *Ice* majority pointed to the historical common law practice of a judge deciding whether to impose consecutive sentences. ___ U.S. at ___, 129 S. Ct. at 718. On this basis alone, *Ice* is distinguishable from this case. The majority cannot point to a common law practice in which the judge made the essential findings, by clear and convincing evidence, that would authorize the judge to sentence the child as an adult. This role was the traditional jury function.

**{70}** I readily concede that the Legislature sought to temper the harsh effects of punishing a fourteen-year-old the same as an adult when our Legislature enacted a juvenile justice system. This noble effort to emphasize rehabilitation, however, must still pass constitutional scrutiny. We must evaluate the legislation as it is currently written to determine whether it is constitutional.[4] Under the Delinquency Act as it is applied to a youthful offender, the State has exercised its discretion to seek adult punishment for the accused child. The State's focus is no longer on rehabilitation. Its focus is now on punishment of the child to the same degree the State would want to punish an adult for the same crime.

**{71}** However, proof only of the essential elements of the charged crime is insufficient to impose an adult sentence on a child. To deprive a child of the right to have a jury determine all of the facts essential to punishing him or her as an adult is both fundamentally unfair and unconstitutional. The Legislature "may not manipulate the definition of a crime in a way that relieves the Government of its constitutional obligations to charge each element in the indictment, submit each element to the jury, and prove each element beyond a reasonable doubt." *Harris*, 536 U.S. at 557.

**{72}** The Court of Appeals correctly concluded that "the juvenile sentence is the baseline sentence because the adult sentence is available only if the court makes the required [additional] factual findings." *State v. Rudy B.*, 2009-NMCA-104, ¶ 43, 147 N.M. 45, 216 P.3d 810. *Apprendi* and its progeny, including *Ice*, teach that if a defendant is being sentenced for a discrete offense, a jury must make all of the necessary findings unless the defendant waives the jury trial or admits the essential facts. In this case it was not the child's admission that he committed the offenses which authorized the judge to sentence him to an adult sentence in an adult prison. All that the judge was authorized to do with the child's admission is commit the child to the Children, Youth & Families Department until he reached age twenty-one. It was only after additional evidence was presented and the judge made additional findings relating to the offense and to the child that the judge could impose

---

[4]As noted by the majority in this case, the juvenile justice system has evolved with different goals at different times. At times the legislation emphasized rehabilitation, and at other times the legislation was more concerned with retribution.

an adult sentence that was decades longer than the juvenile sentence.

## THE SENTENCE RUDY B. RECEIVED WAS OFFENSE SPECIFIC

**{73}** The majority asserts that the findings by the judge were not offense specific and are predictive, which set them apart from the findings considered in *Apprendi*. Majority op. ¶¶ 36, 39. Labeling the findings as predictive is not helpful to the analysis.

> If a State makes an increase in a defendant's authorized punishment contingent on the finding of a fact, that fact-no matter how the State labels it-must be found by a jury beyond a reasonable doubt. A defendant may not be "expose[d] . . . to a penalty *exceeding* the maximum he would receive if punished according to the facts reflected in the jury verdict alone."

*Ring v. Arizona*, 536 U.S. 584, 602 (2002) (citation omitted) (quoting *Apprendi*, 530 U.S. at 483). The focus is not on form but on effect. *Id*.

**{74}** Under New Mexico's juvenile justice system, a judge must first make additional findings relating to both the offense and the child before the judge is authorized to sentence the child as an adult. Section 32A-2-20(C)(1)-(4) requires the judge to consider matters related to the offense.[5] The remaining factors focus on the child. In *Cunningham*, the United States Supreme Court rejected as unconstitutional a system where a sentence was increased based on facts relating to the crime, *the accused*, or other facts considered to be circumstances in aggravation. 549 U.S. at 278-79. The New Mexico Supreme Court also found unconstitutional a statutory scheme that allowed a judge to increase a statutory maximum sentence by making additional findings concerning the offense and the offender. *Frawley*, 2007-NMSC-057, ¶ 23.

**{75}** The essential inquiry is whether the findings involve a sentence for a discrete offense. *Ice*, ___ U.S. at ___, 129 U.S. at 717. It cannot be disputed that the adult sentence received by the child after the sentencing judge made additional findings is related to a discrete crime. He was sentenced as an adult for the specific crimes that he admitted he had committed. The sentencing judge relied on the sentencing statutes that pertained to those crimes. The child admitted that he committed two second-degree felonies and two third-degree felonies with a firearm enhancement. Section 31-18-15 authorized a judge to sentence an adult to twenty-five years total for the same crimes. However, the judge was not entitled to consider the

---

[5]In this case, at the time the child entered his plea, he necessarily admitted the essential facts under Section 32A-2-20(C)(2)-(4). Shooting at or from a motor vehicle with great bodily harm requires willful discharge of a firearm that injures a person. NMSA 1978, § 30-3-8(B) (1987) (amended 1993). However, not all crimes that might result in a child being charged as a youthful offender have all of the elements of Section 32A-2-20(C)(2)-(4), such as robbery.

adult sentencing statutes until the judge made additional findings about both the offense and the child.

**{76}** As we recently noted in *State v. Jones*,

> The finding of non-amenability is the trigger for the court's authority to sentence a youthful offender as an adult. *See* [*State v.*] *Muniz*, 2003-NMSC-021, ¶ 16, 134 N.M. 152, 74 P.3d 86. The finding gives the court the discretion to impose the "adult consequences of criminal behavior" on a child who would be otherwise exempt from adult punishment. [NMSA 1978,] Section 32A-2-2(A) [(1993) (amended 2007)]. Put another way, the finding of non-amenability gives the court the necessary leverage to dislodge a youthful offender from the protective dispositional scheme of the Delinquency Act.

2010-NMSC-012, ¶ 38, 148 N.M. 1, 229 P.3d 474.

**{77}** In *Jones*, this Court was convinced that the Legislature intended to protect children from the adult consequences of criminal behavior. It is not congruent to state that New Mexico seeks to protect children from adult consequences of criminal behavior, and yet deprive children of the same constitutional protections enjoyed by adults accused of committing similar crimes.

**{78}** Once we accept that a youthful offender has a right to a jury trial, the youthful offender should benefit from the traditional functions of the jury to the same extent as an adult. In *Rudy B.*, Judge Sutin raised a concern in his special concurrence about the United States Supreme Court plurality opinion in *McKeiver v. Pennsylvania*, 403 U.S. 528 (1971) (plurality opinion). 2009-NMCA-104, ¶ 64 (Sutin, J., specially concurring). The *McKeiver* Court held that a juvenile in a delinquency proceeding is not entitled to a jury trial. In my opinion, the *McKeiver* Court would have found a right to a jury trial for a youthful offender in New Mexico. The key rationale for the plurality deciding that children are not entitled to jury trials is because no juvenile under either Pennsylvania or North Carolina law could be confined beyond his or her twenty-first birthday, which suggested to the plurality that the juvenile justice system was rehabilitative and did not necessarily involve criminal prosecution. 403 U.S. at 541. The plurality was concerned that requiring a jury trial in delinquency proceedings would "put an effective end to what has been the idealistic prospect of an intimate, informal protective proceeding." *Id*. at 545. I doubt the plurality would find a system where a child can be imprisoned for life in an adult prison to be an "intimate, informal protective proceeding."[6] We ourselves recognize that a child charged as a youthful

---

[6]Recently in *Graham v. Florida*, ___ U.S. ___, ___, 130 S. Ct. 2011, 2031 (2010), the United States Supreme Court expressed its disapproval of a juvenile justice system that allows the imposition of a life without parole sentence on a child based on a subjective

offender is really being tried as an adult and not as a child. For this reason, a grand jury indictment or bind-over order is required and the Rules of Criminal Procedure for the District Court apply. *See* Rule 10-101(A)(2)(b) NMRA. We should not pretend that a child charged as a youthful offender is exclusively in a juvenile rehabilitation system when the State has announced its intention to treat the child as an adult and seek imprisonment in an adult prison. This is particularly true given the inadequate funding of our juvenile justice system and the scarcity of treatment facilities.

**{79}** Indeed, as I read the record, this child was sent to an adult prison, not because he was not amenable to treatment, but because of the unavailability of facilities. While the court evaluator thought that Rudy B. was only adapting to his environment, those who worked with the child while he was in the juvenile detention facility believed he was amenable to treatment. The licensed psychologist who worked with the child was of the opinion that he was amenable to rehabilitation and pointed to his voluntary attendance in group therapy that focused on issues that make violent acting-out more likely. In fact, although the child had reached the age of majority, instead of remanding him to an adult jail, an exception was made to keep him in the juvenile facility.

**{80}** The testimony during the hearing was more of a testament to the lack of available resources than about a child who was not amenable to treatment. It was also mentioned that because Rudy B. was not indigent, he did not qualify for some programs, and the managed care organization (Value Options at the time) would not approve his admission into one of its programs because he did not have a history of other hospitalizations or "treatment episodes."

**{81}** As it pertains to youthful offenders, it seems that the tail is wagging the dog. Simply stated, a youthful offender in New Mexico's current juvenile justice system is treated the way an accused child of the same age was treated at common law. A fourteen- to eighteen-year-old child at common law was entitled to the same constitutional protections as an adult. A youthful offender in New Mexico also should be entitled to the same constitutional protections enjoyed by adults in this state. No matter how much we gloss over it, an amenability hearing is nothing more than a hearing on aggravating circumstances relating to either the offense or the offender.

**{82}** It is unconstitutional when only a judge, and not a jury, makes the findings necessary to increase an adult's sentence beyond the statutory maximum. In New Mexico, a child faces an even more drastic increase in his or her sentence than an adult faces under the aggravating circumstances scheme contained in Section 31-18-15.1, which we declared unconstitutional. We should not tolerate this disparity in treatment. When the words "no person" appear in the Fifth Amendment of the United States Constitution and the words "the accused" appear in the Sixth Amendment, we should not interpret them to mean "no *adult*

---

judgment by a judge or a jury that the child is irredeemably depraved.

26

person" or "the *adult* accused." Similarly, when Article II, Section 12 of the New Mexico Constitution confers the right of trial by jury "to all" and Article II, Section 18 states that "no person" shall be deprived of liberty without due process of law, we should not interpret them to mean "to all *adults*" or "no *adult* person."

**{83}** Ironically, if the Legislature wrote a law to mirror reality, it would be constitutional. By this statement, I mean that the Legislature could have written a law that authorized a judge to sentence a child as an adult based solely on the facts relating to the charged offense as found by a jury beyond a reasonable doubt. The judge could then consider the child's amenability to treatment in available facilities to mitigate the adult sentence. Because commitment to a treatment facility would be within the range authorized by law, the judge, not a jury, could find the mitigating facts, but that is not how the legislation is written. The legislation quite clearly requires additional findings before the judge can impose an adult sentence on a child. Because the additional findings must be made by a jury beyond a reasonable doubt, the next question is whether the legislation is unconstitutional on its face or as it is applied.

**{84}** In my opinion, the legislation is unconstitutional as it is applied, since nothing in the Delinquency Act precludes a judge from empaneling a jury during an amenability hearing. Section 32A-2-20(B) requires "the court" to make the additional findings. This language is different than the language in Section 31-18-15.1, which we declared to be unconstitutional. In Section 31-18-15.1, the Legislature specifically required the judge to make the findings of aggravating circumstances. *Frawley*, 2007-NMSC-057, ¶¶ 27, 31. If we abide by the statutory construction principle that instructs us to attempt to construe a statute to be constitutional, *State v. Flores*, 2004-NMSC-021, ¶ 16, 135 N.M. 759, 93 P.3d 1264, there is precedent for defining "court" to include both the judge and the jury. *Black's Law Dictionary* 352 (6th ed. 1990) ("A body organized to administer justice, and including both judge and jury."). "Court" does not have to be construed to only include a judge, when doing so would render a statute unconstitutional. *See State v. Bean*, 2002 WL 31059235 (N.H. Super. 2002) (unpublished order). Section 32A-2-20(C) refers to having a judge consider certain factors, but it does not preclude a judge from considering such factors as found by a jury beyond a reasonable doubt.

**{85}** Permitting a jury to make these findings does not create any problems and it is consistent with the jury's traditional role to act as the finder of fact, the community conscience, and as a bulwark between the State and the accused, protecting ordinary people from government overreaching. One of common law's longstanding tenets is that the "'truth of every accusation' against a defendant 'should afterwards be confirmed by the unanimous suffrage of twelve of his equals and neighbours.'" *Blakely*, 542 U.S. at 301 (quoting 4 W. Blackstone, *Commentaries on the Laws of England* 343 (1769)).

**{86}** In this case, the sentencing judge heard testimony from both lay people and experts before making the findings that authorized her to sentence the child to an adult sentence in an adult prison. Every day in our courtrooms, jurors from a variety of educational and

27

socioeconomic backgrounds are called upon to weigh similar evidence from a variety of experts. Significantly, jurors are also authorized to consider both mitigating circumstances regarding the offense and the defendant in capital punishment proceedings when deciding whether the defendant should be sentenced to death, including whether the defendant "is likely to be rehabilitated." UJI 14-7029 NMRA.[7] Although we may have faith in our trial court judges, our faith is irrelevant. The child and his or her attorney may believe that twelve adult citizens in a jury box will be more reliable and less idiosyncratic fact finders than a single judge. The child, with advice of counsel, can decide when and under what circumstances to waive a jury trial. We should not preempt that important decision by initially denying the child the full protection of our jury system.

{87}    Most of the Bill of Rights is procedural. Procedure distinguishes the rule of law from rule by whim. Steadfast adherence to procedure provides the greatest assurance that there will be equal justice under law. To deprive a child of the same jury protections afforded an adult is not equal justice.

{88}    For the foregoing reasons, I respectfully dissent.


_____
**EDWARD L. CHÁVEZ, Justice**

**Topic Index for *State v. Rudy B.*, Docket No. 31,909**

| | |
|---|---|
| **CD** | **CHILDREN** |
| CD-AD | Amenability Determination |
| CD-CC | Children's Code |
| CD-CR | Children's Court |
| CD-ST | Sentencing |
| CD-YO | Youthful Offender |
| | |
| **CA** | **CRIMINAL PROCEDURE** |
| CA-JS | Judgment and Sentence |
| CA-RJ | Right to Trial by Jury |
| | |
| **CL** | **CRIMINAL LAW** |
| CL-AG | Aggravating or Mitigating Circumstances |
| CL-ST | Shooting Offences |
| CL-WO | Weapons Offences |

_____

[7]Jurors are also entrusted in civil litigation with finding facts regarding future damages such as loss of earning capacity, future pain and suffering, and such other "predictive findings."

28

| | |
|---|---|
| **CT** | **CONSTITUTIONAL LAW** |
| CT-DJ | Double Jeopardy |
| CT-FD | Federalism |
| CT-SA | States' Rights |
| CT-TJ | Trial by Jury |